# Exhibit A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 (Subchapter V) |
| ONH AFC CS INVESTORS LLC, *et al.*,[1] | Case No. 23-10931 (CTG) |
| Debtors. | (Jointly Administered) |

## AMENDED SMALL BUSINESS DEBTORS' JOINT PLAN OF LIQUIDATION

You are encouraged to carefully review the full text of this document, including all exhibits and attachments, before deciding how to vote on the Plan. To assist you in your review, please note that a list of definitions and a section of frequently asked questions appear at the end of this document.

**IN ADDITION TO CASTING YOUR VOTE TO ACCEPT OR REJECT THE PLAN, YOU MAY OBJECT TO CONFIRMATION OF THE PLAN. IF YOU WISH TO OBJECT TO CONFIRMATION OF THE PLAN, YOU MUST DO SO BY DECEMBER 1, 2023, AT 4:00 P.M. PREVAILING EASTERN TIME.**

**YOUR BALLOT STATING HOW YOU ARE VOTING ON THE PLAN MUST BE RETURNED BY DECEMBER 1, 2023, AT 4:00 P.M. PREVAILING EASTERN TIME. THE BALLOT MUST BE MAILED TO THE FOLLOWING ADDRESS:**

| By first class mail to: | By overnight courier or hand-delivery to: |
|---|---|
| ONH AFC CS Investors LLC | ONH AFC CS Investors LLC |
| c/o Epiq Ballot Processing Center | c/o Epiq Ballot Processing Center |
| P.O. Box 4422 | 10300 SW Allen Blvd |
| Beaverton, OR 97076-4422 | Beaverton, OR 97005 |

**A HEARING ON THE CONFIRMATION OF THE PLAN IS SCHEDULED FOR DECEMBER 14, 2023, AT 10:00 A.M. PREVAILING EASTERN TIME IN COURTROOM No. 7 AT THE U.S. BANKRUPTCY COURT, DISTRICT OF DELAWARE, 824 N. MARKET STREET, WILMINGTON, DELAWARE 19801.**

Your rights may be affected by this Plan. You should consider discussing this document with an attorney.

---

[1] The last four digits of the Debtors' federal tax identification numbers are 1199 (ONH AFC CS Investors LLC) and 6326 (ONH 1601 CS Investors LLC). The Debtors' mailing address is 3445 Peachtree Road, Suite 1225 Atlanta, GA 30326.

Dated: October 25, 2023

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
         mcguire@lrclaw.com
         pierce@lrclaw.com

- and -

**BAKER & HOSTETLER LLP**

Jorian L. Rose (pro hac vice)
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
Email: jrose@bakerlaw.com

Andrew V. Layden (pro hac vice)
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, FL 32801-3432
Telephone: (407) 649-4000
Facsimile: (407) 841-0168
Email: alayden@bakerlaw.com

*Counsel for the Debtors and Debtors in Possession*

# TABLE OF CONTENTS

**Page**

ARTICLE 1 HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTOR ...................... 9

1.1   Nature of the Debtors' Business ................................................. 9

1.2   History of Business Operations of the Debtor ............................. 9

1.3   Filing of the Debtors' Chapter 11 Case ..................................... 12

1.4   Legal Structure and Ownership ................................................ 12

1.5   Debtors' Assets ...................................................................... 12

1.6   Debtors' Liabilities ................................................................ 12

1.7   Current and Historical Financial Conditions ............................. 12

1.8   Events Leading to the Filing of the ......................................... 13

1.9   Significant Events During the Chapter 11 Cases ....................... 13

    A.   First Day Hearing and Orders ........................................ 13

    B.   Employment of Professionals and Advisors ..................... 13

    C.   Claims Process and Bar Date .......................................... 14

    D.   Material Events in the Bankruptcy Cases ......................... 14

1.10  Projected Recovery of Avoidable Transfers ............................. 17

ARTICLE 2 THE PLAN .................................................................................. 17

2.1   Unclassified Claims ............................................................... 18

    A.   Administrative Expenses ................................................ 18

    B.   Priority Tax Claims ....................................................... 19

2.2   Classes of Claims ................................................................... 20

    A.   Classes of Secured Claims .............................................. 20

    B.   Classes of Priority Unsecured Claims .............................. 21

    C.   Classes of General Unsecured Claims .............................. 22

|       | D.   | Classes of Equity Interest Holders | 24 |
|-------|------|------------------------------------|----|
| 2.3   |      | Estimated Number and Amount of Claims Objections | 26 |
| 2.4   |      | Treatment of Executory Contracts and Unexpired Leases | 26 |
| 2.5   |      | Means for Implementation of the Plan | 27 |
|       | A.   | General Overview of the Plan | 27 |
|       | B.   | No Substantive Consolidation of the Debtors | 27 |
|       | C.   | Allocation of Sale and Settlement Proceeds and Interests Between Debtors. | 27 |
|       | D.   | Two Elections for Holders of Equity Interests | 28 |
|       | E.   | Transfers of Property to the Liquidating Trust | 29 |
|       | F.   | Dissolution of the Debtors | 29 |
|       | G.   | The Liquidating Trust | 29 |
|       | H.   | Preservation of Causes of Action | 31 |
|       | I.   | Effectiveness of Securities, Instruments, and Agreements | 32 |
|       | J.   | Effectuating Documents and Further Transactions | 32 |
| 2.6   |      | Payments | 32 |
| 2.7   |      | Post-Confirmation Management | 32 |
| 2.8   |      | Tax Consequences of the Plan | 32 |
| 2.9   |      | Certain U.S. Federal Income Tax Consequences to holders of General Unsecured Claims | 34 |
|       | A.   | Disputed Ownership Fund Treatment | 34 |
|       | B.   | Accrued Interest and OID | 34 |
|       | C.   | Market Discount | 35 |
|       | D.   | Medicare Tax on Net Investment Income | 35 |
| 2.10  |      | Projections in Support of Debtors' Ability to Make Payments Under the Proposed Plan | 36 |

ARTICLE 3 FEASIBILITY OF PLAN ..................................................................36

   3.1   Ability to Initially Fund Plan ...........................................................36

   3.2   Ability to Make Future Plan Payments and Operate Without Further
Reorganization ................................................................................36

ARTICLE 4 LIQUIDATION ANALYSIS ...........................................................36

ARTICLE 5 NO DISCHARGE OF DEBTORS .....................................................37

   5.1   No Discharge ...................................................................................37

ARTICLE 6 GENERAL PROVISIONS ................................................................37

   6.1   Title to Assets .................................................................................37

   6.2   Binding Effect .................................................................................38

   6.3   Severability .....................................................................................38

   6.4   Retention of Jurisdiction by the Bankruptcy Court ..........................38

   6.5   Captions ..........................................................................................38

   6.6   Modification of Plan .......................................................................38

   6.7   Final Decree ....................................................................................39

   6.8   Provisions Governing Distributions ................................................39

         A.   Delivery of Distributions ........................................................39

         B.   Unclaimed Distributions .........................................................39

         C.   Minimum Distributions ...........................................................39

   6.9   Exculpation .....................................................................................39

   6.10   Injunction. ......................................................................................40

   6.11   Revocation of Withdrawal of Plan ..................................................40

   6.12   Governing Law ...............................................................................40

   6.13   Exemption from Transfer Taxes .....................................................40

   6.14   Successors and Assigns ..................................................................40

   6.15   Entire Agreement ...........................................................................40

ARTICLE 7 ATTACHMENTS...............................................................................................41

ARTICLE 8 FREQUENTLY ASKED QUESTIONS...................................................................41

ARTICLE 9 DEFINITIONS.................................................................................................42

**SUMMARY OF THE PLAN AND DISTRIBUTIONS TO CREDITORS**

ONH AFC CS Investors LLC ("ONH AFC") and ONH 1601 CS Investors LLC ("ONH 1601" and together with ONH AFC, the "Debtors") are Delaware limited liability companies formed in 2022 to invest in commercial real estate in Atlanta, Georgia (in the case of ONH AFC) and Miami Beach, Florida (in the case of ONH 1601). As set forth in more detail below, after raising substantial funds from equity investors, (i) the Debtors' proposed real estate transactions did not occur, (ii) the funds contributed to the Debtors have largely been dissipated, and (iii) an independent manager has been appointed to investigate the Debtors' financial condition and maximize available funds for distribution to creditors and equity investors.

The Debtors have spent a majority of their time and efforts investigating how the funds were dissipated, conducting diligence, and negotiating settlements and other resolutions with Mr. Elchonon (also known as "Elie") Schwartz, certain entities closely held by Mr. Elie Schwartz, and certain real estate companies operating together with Nightingale Properties, LLC (these entities are referred to herein and as more specifically defined below as the "Schwartz Nightingale Parties"). These settlements are critical to funding the Plan and repayment of creditors and investors. The Debtors negotiated a payment in the amount of $8.8 million for the sale of Miami real estate as described below (the "1601 Motion") and a global settlement with the Schwartz Nightingale Parties that allows for a sufficient amount to repay all investors over the next three years (the "Schwartz Nightingale Settlement").[2]

The Independent Manager believes that the Schwartz Nightingale Settlement will provide substantial benefit to the investors and is in the best interests of all stakeholders in these Chapter 11 Cases.

Additionally, the Debtors have reached an optional settlement agreement (the "CrowdStreet Settlement"), for their respective investors with CrowdStreet, Inc. ("CrowdStreet" or the "DIP Lender") regarding (i) the subordination of repayment of CrowdStreet's prepetition unsecured claims and DIP Claims to all investor capital in both Debtors and (ii) additional loans to be made available for the benefit of and subordinate to investors, in the event of a Schwartz Nightingale Parties' default. The Debtors believe that this settlement may generate substantial value for the investors if they so elect. In all, CrowdStreet will be providing $5 million dollars of value to the Trust on behalf of investors, if sufficient investors opt-in to this settlement. More specifically, the amount of CrowdStreet claims and potential amount available for new subordinated loans from CrowdStreet will be dependent on the dollar amount of investor capital claims that elect to release any alleged claims (if any) against CrowdStreet (the "CS Opt-In"). To the extent that an insufficient dollar amount of investor capital claims elect to participate in the CS Opt-In, the Debtors, or the Liquidating Trust once formed, will first repay the unsubordinated portion of the CrowdStreet claims before any distributions are otherwise made to investors.

This Chapter 11 Plan generally contemplates each Debtors' respective assets being monetized and the net proceeds being distributed to creditors and equity security holders in accordance with the priorities set forth in this Plan and the Bankruptcy Code. To accomplish this,

---

[2] As of the filing of this Plan, the Debtors are waiting on one signature page from the Schwartz Nightingale Parties and reserve all of their rights with respect to the Schwartz Nightingale Settlement.

each of the Debtors will contribute all of their respective assets to a Liquidating Trust (collectively, the "Liquidating Trust"), which will be operated by the Liquidating Trustee, in consultation with the Liquidating Trust Committee, and charged with maximizing the value of such assets.

The Liquidating Trust will have standing to pursue all of the Debtors' Claims and Causes of Action. All proceeds of the foregoing received by the Liquidating Trust will be used first to pay its expenses as provided for in the Plan and Liquidating Trust Agreement, and second, to pay the Debtors' respective creditors and holders of equity interests, in accordance with the terms of the Plan and the Bankruptcy Code. The Debtors will not continue in business and will be dissolved after the occurrence of the Effective Date.

The following chart provides a summary of the anticipated recovery to holders of Claims or Interests under the Plan. For the avoidance of doubt, the estimates of Claims or Interests and the projected recoveries set forth in the chart below are estimates only and therefore are subject to change.

| Class | Type | Estimated Amount of Claims | Recovery Estimate | Treatment | Entitled to Vote? |
|---|---|---|---|---|---|
| 1 | Allowed DIP Claims | Approximately $1,805,000.00 | 0-100% - dependent on results of CS Opt-In | Impaired. Class 1 consists of the Allowed DIP Claims. Except for the portion of DIP Claims that constitute Subordinated DIP Claims, the Allowed DIP Claims shall be paid as soon as the Liquidating Trust has sufficient funds to make such payment as the first priority administrative level expenses of the Liquidating Trust after the Effective Date before payment to any other creditor or Equity Interest Holder. For the avoidance of doubt, the DIP Lender shall be entitled to agree to a less favorable treatment than that set forth herein. Subordinated DIP Claims shall be subordinated for purposes of payment to all other Classes under the Plan and shall be paid only to the extent such Classes are paid in full. The Subordinated DIP Claims shall be calculated as 10% of the dollar amount of Equity Interests that elect the CS Opt-In (as described herein) determined without counting the CS Fund Investors. For the avoidance of doubt, Allowed DIP Claims shall only | Yes. |

| | | | | be subject to subordination after Allowed CS Pre-Petition Claims have been subordinated.<br><br>To the extent (i) the Subordinated DIP Claims plus the Subordinated CS Pre-Petition Claims is greater than the total amount of Allowed DIP Claims plus the Allowed CS Pre-Petition Claims, and (ii) as of the date of any determination that there has occurred a payment default by the Schwartz Nightingale Parties under the Schwartz Nightingale Settlement and such default continues to exist and has not been cured after 30 days, the DIP Lender shall make the Liquidating Trust Loan (as defined below) to the Liquidating Trust and such amount shall be treated in the same manner as a Subordinated DIP Claim. Allowed DIP Claims shall accrue interest at the rate of 5.00% per annum as provided under the DIP Loan Documents. Subordinated DIP Claims and the Liquidating Trust Loan shall accrue interest at the Default Rate as provided in the DIP Loan Documents. | |
| 2 | Allowed Priority Non-Tax Claims against ONH AFC | $0.00 | 100% | Unimpaired. Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against ONH AFC agrees to less favorable treatment, the Holder of such a claim will receive from ONH AFC (i) payment in full in Cash, or (ii) such other treatment as to which the holder of an Allowed Priority Non-Tax Claim agrees. | No. Deemed to accept. |
| 3 | Allowed Priority Non-Tax Claims against ONH 1601 | $0.00 | 100% | Unimpaired. Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against ONH 1601 agrees to less favorable treatment, the Holder of such a claim will receive from ONH 1601 (i) payment in full in Cash, or (ii) such other treatment as to which the holder | No. Deemed to accept. |

| | | | | of an Allowed Priority Non-Tax Claim agrees. | |
|---|---|---|---|---|---|
| 4 | General Unsecured Claims against ONH AFC | Claims filed and scheduled against ONH AFC in the amount of approximately $1,495,000<br><br>ONH AFC anticipates the ultimate amount of Allowed General Unsecured Claims at approximately $400,000 (held by CrowdStreet) | 0-100% - dependent on results of CS Opt-In | Impaired. This class consists of all General Unsecured Claims against ONH AFC. Except for the Subordinated CS Pre-Petition Claims, each holder of an Allowed General Unsecured Claim against ONH AFC shall receive a Pro Rata Share of Creditor Beneficial Interests in the Liquidating Trust entitling the Holder to payment in full from the Liquidating Trust prior to any distributions to holders of Equity Interests in ONH AFC.<br><br>Subordinated CS Pre-Petition Claims shall be subordinated for purposes of payment to all other Classes under the Plan and shall be paid only to the extent such Classes are paid in full as set forth herein. Subordinated CS Pre-Petition Claims shall be calculated as 10% of the dollar amount of Equity Interests that elect the CS Opt-In (as described herein) that exceeds the amount of the DIP Claims. Subordinated CS Pre-Petition Claims shall accrue interest at the Default Rate.<br><br>Each holder of a Class 4 Claim shall have the option of electing to assign all Investor Individual SN Claims it holds to the Liquidating Trust in exchange for 5% annual simple interest on the unpaid amount of such holder's Allowed Class 4 Claim, beginning on the Effective Date and ending on the date of payment, to be paid after recovery of its Allowed Class 4 Claim (the "SN Opt-In"); provided however that any election for a Class 4 Claim that is reclassified as a Class 6 Claim shall be treated as being made in Class 6.<br><br>Each holder of a Class 4 Claim shall have the option to opt-in to the CS | Yes. |

| | | | | Release in exchange for CrowdStreet's agreement described in this Plan to subordinate certain of its claims and make available the Liquidating Trust Loan, as described in Section 2.5.D.2 below.<br><br>To opt-in to the CS Opt-In, the holder should check the appropriate "CS OPT-IN" box on its Ballot.<br><br>To opt-in to the SN Opt-In, the holder should check the appropriate "SN OPT-IN" box on its Ballot. | |
|---|---|---|---|---|---|
| 5 | General Unsecured Claims against ONH 1601 | Claims filed in the amount of approximately $525,000<br><br>ONH 1601 anticipates the ultimate amount of Allowed General Unsecured Claims at approximately $400,000 (held by CrowdStreet) | 0-100% - dependent on results of CS Opt-In | Impaired. This class consists of all General Unsecured Claims against ONH 1601. Except for the Subordinated CS Pre-Petition Claims, each holder of an Allowed General Unsecured Claim against ONH 1601 shall receive a Pro Rata Share of Creditor Beneficial Interests in the Liquidating Trust entitling the Holder to payment in full from the Liquidating Trust prior to any distributions to holders of Equity Interests in ONH 1601.<br><br>Subordinated CS Pre-Petition Claims shall be subordinated for purposes of payment to all other Classes under the Plan and shall be paid only to the extent such Classes are paid in full as set forth herein. Subordinated CS Pre-Petition Claims shall be calculated as 10% of the dollar amount of Equity Interests that elect the CS Opt-In (as described herein) that exceeds the amount of the DIP Claims.<br><br>Each holder of a Class 5 Claim shall have the option of electing to assign all Investor Individual SN Claims it holds to the Liquidating Trust in exchange for 5% annual simple interest on the unpaid amount of such holder's Allowed Class 5 Claim, beginning on the Effective | Yes. |

| | | | | Date and ending on the date of payment, to be paid after recovery of its Allowed Class 5 Claim; provided however that any election for a Class 5 Claim that is reclassified as a Class 7 Claim shall be treated as being made in Class 7.<br><br>Each holder of a Class 5 Claim shall have the option to opt-in to the CS Release in exchange for CrowdStreet's agreement described in this Plan to subordinate certain of its claims and make available the Liquidating Trust Loan, as described in Section 2.5.D.2 below.<br><br>To opt-in to the CS Opt-In, the holder should check the appropriate "CS OPT-IN" box on its Ballot.<br><br>To opt-in to the SN Opt-In, the holder should check the appropriate "SN OPT-IN" box on its Ballot. | |
| 6 | Equity Interests in ONH AFC and Section 510(b) Subordinated Claims | Approximately $44 million | 0-100% | Impaired. Each holder of an Allowed Equity Interest in ONH AFC or a Section 510(b) Subordinated Claim in ONH AFC shall receive a Pro Rata Share of Equity Beneficial Interests in the Liquidating Trust entitling the Holder to a pro rata share of all Liquidating Trust Assets remaining after payment of all other amounts required to be paid under the Plan.<br><br>Each holder of an Equity Interest in ONH AFC or a Section 510(b) Subordinated Claim in ONH AFC shall have the option of electing to assign all Investor Individual SN Claims it holds to the Liquidating Trust in exchange for 5% annual simple interest on the unpaid amount of such holder's Equity Interest, beginning on the Effective Date and ending on the date of payment, to be | Yes. |

| | | | | paid after recovery of its Equity Interest (the "<u>SN Opt-In</u>"). | |
|---|---|---|---|---|---|
| | | | | ONH AFC believes that each person or entity that made an equity investment into ONH AFC should be classified and receive the same treatment under the Plan as other Claims in Class 6. For any proof of claim filed by an investor asserting a creditor claim (rather than an equity interest), ONH AFC intends to (i) seek an agreement with such investor to have its claim receive the treatment specified by this Plan for Claims in Class 6 or (ii) file an objection under Bankruptcy Code Section 510(b) or otherwise request that the Bankruptcy Court treat such claim as a Class 6 Claim. | |
| | | | | Each holder of a Class 6 Claim shall have the option to opt-in to the CS Release in exchange for CrowdStreet's agreement described in this Plan to subordinate certain of its claims and make available the Liquidating Trust Loan, as described in Section 2.5.D.2 below. | |
| | | | | To opt-in to the CS Opt-In, the holder should check the appropriate "CS OPT-IN" box on its Ballot. | |
| | | | | To opt-in to the SN Opt-In, the holder should check the appropriate "SN OPT-IN" box on its Ballot. | |
| 7 | Equity Interests in ONH 1601 and Section 510(b) Subordinated Claims | Approximately $8.8 million | 0-100% | Impaired. Each holder of an Allowed Equity Interest in ONH 1601 or a Section 510(b) Subordinated Claim in ONH 1601 shall receive a Pro Rata Share of Equity Beneficial Interests in the Liquidating Trust entitling the Holder to a pro rata share of all Liquidating Trust Assets after payment of all other amounts required to be paid under the Plan. | Yes. |

|  |  |  |  | Each holder of an Equity Interest in ONH 1601 or a Section 510(b) Subordinated Claim in ONH 1601 shall have the option of electing to participate in the SN Opt-In by assigning all Investor Individual Claims it holds to the Liquidating Trust in exchange for 5% annual simple interest to be paid after recovery of its Equity Interest.<br><br>ONH 1601 believes that each person or entity that made an equity investment into ONH 1601 should be classified and treated in Class 7. For any proof of claim filed by an investor asserting a creditor claim (rather than an equity interest), ONH AFC intends to (i) seek an agreement with such investor to have its claim receive the same treatment under the Plan as shall be given to other Claims in Class 7 or (ii) file an objection under Bankruptcy Code Section 510(b) or otherwise request that the Bankruptcy Court treat such claim as Class 7 Claim.<br><br>Each holder of a Class 7 Claim shall have the option to opt-in to the CS Release in exchange for CrowdStreet's agreement described in this Plan to subordinate certain of its claims and make available the Liquidating Trust Loan, as described in Section 2.5.D.2 below.<br><br>To opt-in to the CS Opt-In, the holder should check the appropriate "CS OPT-IN" box on its Ballot.<br><br>To opt-in to the SN Opt-In, the holder should check the appropriate "SN OPT-IN" box on its Ballot. |  |

**ARTICLE 1**
**HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTOR**

### 1.1    Nature of the Debtors' Businesses.

ONH AFC CS Investors LLC ("ONH AFC") and ONH 1601 CS Investors LLC ("ONH 1601" and together with ONH AFC, the "Debtors") are Delaware limited liability companies formed in 2022 to invest in commercial real estate in Atlanta, Georgia (in the case of ONH AFC) and Miami Beach, Florida (in the case of ONH 1601).

## 1.2   History of Business Operations of the Debtor.

Mr. Elchonon (also known as "Elie") Schwartz, formed ONH AFC and ONH 1601 as part of a group of companies to invest in real estate organized under Nightingale Properties LLC ("Nightingale"). ONH AFC was created as a real estate company whose sole purpose was to contribute equity to fund the purchase of the Atlanta Financial Center, a large commercial real estate complex in Atlanta, Georgia, located at 3333 Peachtree Road NE, 3343 Peachtree Road NE, and 3353 Peachtree Road NE (the "Atlanta Financial Center"). The Atlanta Financial Center is in the Buckhead area of Atlanta and is comprised of three interconnected office towers and an on-site parking garage. Among other tenants, there are two longstanding anchor tenants—a major bank and a 180+ lawyer U.S. law firm. ONH 1601 was created to purchase equity interests in Lincoln Place, a mixed-use building in Miami Beach, Florida, located at 1601 Washington Ave, 1605 Washington Ave, and 1619 Washington Ave ("Lincoln Place"). Lincoln Place was owned in part, and managed, by the Nightingale group of companies prior to the Offering. It was previously fully occupied for two decades, but its major tenant vacated in early 2022, which presented an opportunity for a renovation and new potential major tenants. The sole purpose of ONH 1601 was to recapitalize Lincoln Place.

Mr. Schwartz, through the Debtors and other affiliates, planned to purchase and renovate the Atlanta Financial Center and to provide a large renovation investment in Lincoln Place with: (1) equity raised from investors in ONH AFC and ONH 1601, respectively, through securities offerings conducted on a platform described in more detail below that is operated by CrowdStreet, Inc. ("CrowdStreet") (an online registered broker-dealer), (2) equity raised from other investors, (3) equity contributed from Nightingale or related entities, and (4) senior secured debt. At the time of the Offerings (defined below) the Debtors' manager was One Night Holdings, LLC ("One Night"), a Nightingale affiliate. Under the terms of the investment plans for the Debtors, One Night (or its affiliates) would contribute capital of approximately 10% and the remaining 90% would be obtained from additional outside investors in the Debtors. One Night's equity contribution would be made on a subordinated basis to the investors' equity. Accordingly, One Night would be considered a "Subordinated Return Member" and the outside investors would be considered "Priority Return Members."[3]

Nightingale managed One Night. Nightingale is a privately-held commercial real estate investment firm controlled and founded by Mr. Schwartz who serves as its chief executive officer. According to the private placement memoranda ("PPMs") sent to potential investors for the Atlanta Financial Center and Lincoln Place projects, Nightingale was founded in 2005 and has owned or managed over 22 million square feet in more than 22 states.

---

[3] There is a discrepancy in how the Subordinated Return Member is defined in the Operating Agreements. In the whereas clauses of the Operating Agreements, a company called ONH Promote LLC is defined as the Subordinated Return Member for both Debtors. However, the signature blocks on the Operating Agreements list One Night Holdings LLC as the Subordinated Return Member for both Debtors.

Under Mr. Schwartz's management, the Debtors' initial goals were to raise $16 million for ONH AFC and $15 million for ONH 1601 from accredited investors by means of a private placement under Regulation D of the Securities Act of 1933. Accredited investors in ONH AFC and ONH 1601 executed subscription agreements for the purpose of providing equity to fund the purchase, leasing, reposition, and renovation of the Atlanta Financial Center and the recapitalization and renovation of Lincoln Place, respectively. The minimum investment per investor was $25,000.

To accomplish the Offerings (defined below), Nightingale executed agreements with CrowdStreet to obtain additional investments through offerings for ONH AFC and ONH 1601 through a website known as the CrowdStreet Marketplace (the "AFC Offering" and "1601 Offering", collectively the "Offerings"). On May 26, 2022, Nightingale launched the AFC Offering on the CrowdStreet Marketplace, where accredited investors could review AFC Offering materials, learn more about the Atlanta Financial Center, and complete their investment documents. On November 1, 2022, Nightingale launched the 1601 Offering on the CrowdStreet Marketplace, where accredited investors could review materials for Lincoln Place similar to the AFC Offering and complete their investment documents. The subscription agreements provided for the investment of capital into ONH AFC and ONH 1601 bank accounts controlled by Mr. Schwartz. Prior to the appointment of the Independent Manager, ONH AFC initially held a bank account with First Republic Bank and presently holds an ONH AFC bank account and an ONH 1601 bank account at JPMorgan.

The Offerings provided for funding dates of June 27, 2022 (ONH AFC) and December 12, 2022 (ONH 1601) for investments completed via the CrowdStreet Marketplace. Investments were accepted as late as February 2023 (ONH AFC) and March 2023 (ONH 1601). Investors invested between $25,000 and $1.75 million in membership interests in the Debtors. ONH AFC raised approximately $54 million from 654 investors for the Atlanta Financial Center project—far beyond the original $16 million goal. According to preliminary data supplied by the CrowdStreet Marketplace to investors, at this time it is believed that several million has been returned to investors. ONH 1601 raised approximately $8.8 million from 167 investors for the Lincoln Place project—below the $15 million goal. It is believed that approximately $125,000 has been returned to investors related to that project. The Debtors are continuing to obtain and reconcile information regarding the investments and the sources and uses of the funds.

Under Nightingale's agreement with CrowdStreet, the funds raised from investors were to be held by Nightingale in segregated accounts until the closing of the Atlanta Financial Center and Lincoln Place projects. The PPMs provided that "[t]he proceeds from this Offering will be used to purchase, lease, reposition, and extensively renovate" the properties. The Subscription Agreements only allowed "[the Debtors to] use any proceeds from this Offering, net of any organizational and offering expenses, to fund through its direct or indirect subsidiaries [the properties] … Managed by One Night Holdings LLC, a Delaware limited liability company." The Operating Agreements further provided that the Manager had a fiduciary duty to safeguard the funds and prohibit commingling or use of the money that did not benefit the Debtors.

On or around September 6, 2022, Nightingale published a note to investors on the CrowdStreet Marketplace providing an update on the Atlanta Financial Center project. Nightingale

described a modified debt financing plan and stated that it anticipated the closing on the purchase of the Atlanta Financial Center would occur in the last quarter of 2022. Nightingale also answered several investors' inquiries regarding its track record on certain other real estate deals and offered to accept additional investments from investors. On or around October 20, 2022, Nightingale provided an additional update to investors, providing details on a new debt term sheet and improved terms from the seller, and projecting the property closing would occur in November 2022, and again offering to allow investors to increase their investment amount. Several months later, in January 2023, Nightingale further updated investors that it had signed a term sheet with yet another new lender. Several months later, on or around April 4, 2023, CrowdStreet sent a letter to investors sharing another update from Nightingale indicating that the acquisition of the Atlanta Financial Center was further delayed and providing details on continued negotiations with the seller and real estate lenders. On May 5, 2023, Nightingale published an update on the 1601 Offering, indicating that it was in the final stages of closing on the remaining equity and had finalized debt terms and expected closing on the equity transaction for the Lincoln Place project to occur within 60-90 days.

On May 31, 2023, investors on both projects received another update from CrowdStreet detailing further developments on the Atlanta Financial Center and Lincoln Place, and requesting investor action to appoint a new, independent manager of ONH AFC and ONH 1601. The letters explained that some investors were requesting refunds on their investments, but that Nightingale had not processed those refunds timely or consistently. Although some refunds were apparently paid (related to ONH AFC), many requests remained outstanding. The letters also provided that CrowdStreet had made previous requests of the Debtors but was unable to verify whether any funds were available to pay investors. Accordingly, in the letters, CrowdStreet proposed, and Nightingale agreed, that an independent manager be appointed for ONH AFC and ONH 1601, and CrowdStreet requested that the investors vote on the appointment of Anna Phillips to serve as independent manager and fiduciary on behalf of the investors and to manage the timely and orderly wind down of ONH AFC and ONH 1601.

Effective June 7, 2023, One Night resigned as manager of ONH AFC and ONH 1601 after the investors overwhelmingly voted in favor of the appointment of Ms. Anna Phillips. Accordingly, Ms. Phillips assumed the role of sole and independent manager (the "Independent Manager"). Ms. Phillips sent a letter to investors on June 8, 2023, introducing herself as Independent Manager and stating that her focus was to develop and execute a plan to maximize and return value to the investors. To that end, since her appointment, Ms. Phillips has launched an independent investigation into the location and use of the funds raised from investors through the CrowdStreet Marketplace.

Ms. Phillips has learned that the ONH AFC bank account at JPMorgan had a balance of approximately $125,000 as of June 1, 2023. Additionally, the ONH 1601 bank account at JPMorgan had a balance of approximately $1,600 as of June 1, 2023. In short, almost all the funds raised by the Debtors had been withdrawn from the Debtors' bank accounts prior to her appointment. Upon learning that almost all of the funds raised had been withdrawn, Ms. Phillips immediately began making inquiries as to the status of the funds and how to return them to the Debtors.

On July 5, 2023, Ms. Phillips sent another letter to the investors inviting them to a live webinar update on July 14, 2023. On July 14, 2023, Ms. Phillips informed investors of the commencement of these Chapter 11 Cases (as defined below) and explained how these Chapter 11 Cases will significantly enhance Ms. Phillips' investigative tools and capability to successfully pursue claims on behalf of investors using the Bankruptcy Code's statutory and equitable authority and protections.

### 1.3    Filing of the Debtors' Chapter 11 Cases.

On July 14, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Subchapter V of the Bankruptcy Code. These Chapter 11 Cases are pending in the United States Bankruptcy Court for the District of Delaware.

### 1.4    Legal Structure and Ownership.

The Debtors are Delaware limited liability companies formed in 2022 to invest in commercial real estate in Atlanta, Georgia (in the case of ONH AFC) and Miami Beach, Florida (in the case of ONH 1601).

The ONH AFC Offering closed around June 27, 2022.  ONH AFC raised approximately $54 million from 654 investors for the Atlanta Financial Center project. Although the Independent Manager's investigation remains ongoing, it is believed that approximately $10 million has been returned to investors at this time.

The ONH 1601 Offering closed around December 16, 2022. ONH 1601 raised approximately $8.8 million from 167 investors for the Lincoln Place project. Approximately $125,000 has been returned to investors related to that project.

### 1.5    Debtors' Assets.

Ms. Phillips' investigation into the Debtors' assets is continuing. At this time, it is believed that the Debtors' assets primarily consist of a minimal amount of cash on hand and Causes of Action (i.e., the right to sue) against third parties. These assets have an unknown current value.

### 1.6    Debtors' Liabilities.

Ms. Phillips' investigation into the Debtors liabilities is ongoing. At this time, it is believed that the Debtors have minimal liabilities to creditors (aside from CrowdStreet) and that the vast majority of interested parties are investors who contributed funds into the Debtors in exchange for Equity Interests.

### 1.7    Current and Historical Financial Conditions.

Ms. Phillips' investigation of the historical financial condition of the Debtors is ongoing. It appears the Debtors did not maintain financial statements in the ordinary course of business.

Ms. Phillips has learned that the ONH AFC bank account at JPMorgan had a balance of approximately $125,000 as of June 1, 2023. Additionally, the ONH 1601 bank account at

JPMorgan had a balance of approximately $1,600 as of June 1, 2023. In short, almost all of the funds raised by the Debtors were withdrawn from the Company's bank accounts prior to her appointment as Independent Manager.  As of the bankruptcy Petition Date, similar amounts of funds remained in the Debtors' accounts.

**1.8    Events Leading to the Filing of the Chapter 11 Cases**.

The events leading to the Debtors filing these Chapter 11 Cases are set forth in Section 1.2.

**1.9    Significant Events During the Chapter 11 Cases**.

**A.    First Day Hearing and Orders**.

On the Petition Date, the Debtors filed certain "first day" motions with the Bankruptcy Court seeking various forms of relief designed to facilitate a smooth transition into these Chapter 11 Cases. On July 21, 2023, the Bankruptcy Court held the first day hearing in these Chapter 11 Cases and entered the following orders:

- o  *Order Granting Debtors' Motion for Entry of an Order (I) Approving the Scope and Form of Notice with Respect to Investors, (II) Approving Opt-In Procedure for Additional Notice, and (III) Granting Related Relief* [Doc. No. 40];

- o  *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Granting Liens and Superpriority Administrative Expense Status, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Scheduling a Final Hearing* [Doc. No. 43];

- o  *Order Granting Debtors' Motion for Turnover of Books and Records* [Doc. No. 42];

- o  *Order (I) Authorizing Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Certain Related Relief* [Doc. No. 39];

- o  *Order (I) Approving the Retention of EPIQ Corporate Restructuring, LLC as the Claims and Noticing Agent to the Debtors, Effective Nunc Pro Tunc to the Petition Date, and (II) Granting Related Relief* [Doc. No. 41].

**B.    Employment of Professionals and Advisors; Appointment of Trustee**.

The Debtors have also requested that the Bankruptcy Court approve its employment of various professionals and advisors to assist with the successful prosecution of these Chapter 11 Cases. Specifically, the Debtors requested Bankruptcy Court's approval to retain and employ: (i) Baker & Hostetler LLP as their legal counsel; (ii) Landis Rath & Cobb LLP as their co-counsel; (iii) B. Riley Financial Inc. to act as Chief Restructuring Officer; and (iv) Epiq Corporate Restructuring, LLC as its claims and noticing agent.  The Bankruptcy Court has considered these requests to approve employment of professionals and advisors and entered orders approving their employment. [Doc. Nos. 41, 89, 90, 91].

On July 17, 2023, the United States Trustee appointed Mr. David Klauder, Esq. of the law firm Bielli & Klauder, LLC as Subchapter V Trustee.

###### C.      **Claims Process and Bar Date**.

2.      **Schedules and Statements**. On July 28, 2023, the Debtors filed their respective schedules of assets and liabilities and statements of financial affairs (the "Schedules and Statements") with the Bankruptcy Court. On August 22, 2023, the U.S. Trustee held the meeting of creditors pursuant to section 341(a) of the Bankruptcy Code.

3.      **Bar Dates.** As set forth in the *Notice of Chapter 11 Bankruptcy Case* [Doc. No. 54] and the *Order Granting Motion for Entry of an Order (A) Establishing Bar Date for Filing Proofs of Interest; (B) Approving the Form and Manner for Filing Proofs of Interest; and (C) Approving Notice Thereof* [Doc. No. 105], the General Bar Date was September 12, 2023; the Proof of Interest Bar Date was September 30, 2023; and the Governmental Unit Bar Date is January 10, 2024.

###### D.      **Material Events in the Bankruptcy Cases**

###### Sale of Lincoln Place.

1.      On October 2, 2023, the Debtors filed a Motion for Entry of an Order (I) Authorizing the Use of Property of Estate Outside of the Ordinary Course of Business, (II) Authorizing the Release of Any Causes of Action Against the Buyer and the Lincoln Place Property, and (III) Granting Related Relief, requesting the Bankruptcy Court's authority to enter into a transaction for the sale of Lincoln Place in order to benefit the chapter 11 bankruptcy estates and the creditors and their investors (the "1601 Motion") [Doc. No. 134]. Lincoln Place, a mixed-use building in Miami Beach, Florida located at 1601 Washington Avenue, is the property for which the Schwartz Nightingale Parties raised equity in connection with the formation of Debtor ONH 1601 CS Investors, LLC. In connection with the proposed transaction, Debtor ONH 1601 CS Investors, LLC was supposed to receive equity in the owner of the entity that owned Lincoln Place. No transaction closed for the purchase of any interest in Lincoln Place whether directly or indirectly. Thus, the Schwartz Nightingale Parties continued to hold the interests they had in Lincoln Place. The Schwartz Nightingale Parties hired a third-party broker to market and sell Lincoln Place.

2.      The 1601 Motion requested, among other things, the Bankruptcy Court's authorization for the Debtors to provide releases to the purchasers, or their successors and assigns, of Lincoln Place in exchange for, among other things, (I) payment to the Debtors in the amount of $8.83 million, and (II) the Schwartz Nightingale Parties agreeing to escrow any other amounts payable to the Schwartz Nightingale Parties in connection with the sale of Lincoln Place. The 1601 Motion also provides that:

(1)      The payment of amounts to the Debtors' estates and releases provided to the buyer of Lincoln Place are contingent on the closing of the sale of Lincoln Place. While the Debtors are hopeful that such sale could occur prior to the proposed confirmation and effective date of the Plan, there is no assurance that such closing will occur.

(2)     In connection with the 1601 Motion, the proposed buyer provided an affidavit that it has no connection to Mr. Schwartz or Nightingale and that there is no other arrangement contemplated other than the sale of Lincoln Place for the amounts disclosed.

(3)     The 1601 Motion also provided that the allocation of the proceeds from the 1601 Motion and sale of Lincoln Place would be determined under this Plan.

3.     That allocation of the proceeds from the Sale of Lincoln Place are described herein in Section 2.5 below.

**Settlement with the Schwartz Nightingale Parties.**

1.     The settlement with the Schwartz Nightingale Parties forms the basis for the payments to be made under the Plan, together with the proceeds derived from the 1601 Motion.  The Debtors engaged in substantial due diligence and negotiated for more than three months with the Schwartz Nightingale Parties regarding a settlement on behalf of the Debtors' estates and investors to the extent they determine to opt-in and assign their claims. The Debtors and the Nightingale Schwartz Parties entered into the Schwartz Nightingale Settlement as of October 2, 2023, which is subject to the Bankruptcy Court's approval in connection with this Plan.

2.     A copy of the Schwartz Nightingale Settlement is attached hereto as **Exhibit 2** and is summarized below. Given its complexity, the Debtors did not attempt to provide every term or condition in the summary but just certain commercial terms. The Debtors do not waive or limit the Debtors' or Liquidating Trust's rights with respect to any provision in the Schwartz Nightingale Settlement as set forth specifically therein.[4]

(1)     An initial payment of $3 million no later than December 31, 2023.

(2)     The balance of the Aggregate Repayment Amount (as defined in the Schwartz Nightingale Settlement) in equal quarterly payments to the Liquidating Trust which amount is calculated as follows:

a.    the net amounts invested in the Debtors through CrowdStreet;

b.    the amounts invested in the Debtors by Garden Growth LLC to the extent such party executes a joinder ($1 million);

c. $1 million (which is an estimate of the initial amount of the expenses of the Liquidating Trust);

d.  repayment of the unforgiven amount of the DIP Loan; and

---

[4] In the event of a conflict between the summary in this section and the terms of the Schwartz Nightingale Settlement, the Schwartz Nightingale Settlement controls.

e. any loans to or expenses of the Debtors or the Liquidating Trust approved by the Court.

(3)     The Liquidating Trust will be provided a security interest and liens on the Debtors' assets not otherwise subject to a lien.

(4)     The Schwartz Nightingale Parties shall provide consent judgments to the extent they do not comply with the Schwartz Nightingale Settlement.

(5)     The Schwartz Nightingale Parties shall provide the Liquidating Trust with regular disclosure regarding the status of their asset disposition to complete the Schwartz Nightingale Settlement payments.

3.     The Schwartz Nightingale Settlement also provides that, to the extent an investor opts-in and assigns their claims to the Liquidating Trust, such investor shall receive simple annual interest equal to 5% of its remaining unpaid claim, after payment of its original investment amount. To the extent any investor does not opt-in, such investor shall receive the repayment of its invested amount but without interest.

**The CrowdStreet Settlement Proposal**

The Debtors have also proposed for the following settlement of CrowdStreet claims against the Debtors (including the repayment of any DIP Loan or unsecured claims) as well as potentially providing additional funding to the Liquidating Trust in the event of a default by the Schwartz Nightingale Parties of their performance under the Schwartz Nightingale Settlement.

In order to facilitate the Debtors being able to commence these Chapter 11 Cases and as a method to provide a collective action on behalf of investors in support of efforts to recover investor money against the Schwartz Nightingale Parties, CrowdStreet lent the Debtors $400,000 on a pre-petition unsecured joint and several basis and committed to lend an additional $1,805,000 in connection with the Bankruptcy Court-approved Debtor-In-Possession financing package. CrowdStreet has now additionally agreed to subordinate all of those amounts lent to the repayment of investors in full of the Liquidating Trust if sufficient investors release any alleged claims against CrowdStreet. Also, if a sufficient dollar amount of investor capital opts-in, CrowdStreet has also agreed to make additional funds available to the Liquidating Trust which will be subordinate to the repayment of investors should the Schwartz Nightingale Parties default on any payments they are required to make under the Schwartz Nightingale Settlement.

The specific terms of this settlement provide that (i) CrowdStreet subordinate its Prepetition Claims and DIP Claims and (ii) make new subordinated loans available to the Liquidating Trust in the amount of 10% of the invested capital in the Debtors by such investors that elect to release any alleged claims against CrowdStreet. For the avoidance of doubt, the Allowed or Subordinated CS Pre-Petition Claims will be subject to subordination prior to any Allowed DIP Claims. Since there is $400,000 in unsecured CrowdStreet claims and potentially $1,805,000 million in DIP Claims, CrowdStreet has agreed to subordinate repayment of those claims to the ability of investors to receive repayment of their investments in an amount equal to 10% of the investment amount by electing on their ballots to release claims against CrowdStreet. For example, if $22,050,000 elect to release their claims against CrowdStreet then all CrowdStreet

pre-petition claims and DIP Claims will be subordinated. Once that threshold has been reached, CrowdStreet has also agreed to provide additional subordinated loans to the Liquidating Trust in amount equal to 10% of the amount of investor claims that opt-in in excess of that amount. Those subordinated loans would be available to the Liquidating Trust in the event of the Schwartz Nightingale Parties' default under the Schwartz Nightingale Settlement. For example, should $50,000,000 of investor claims elect to opt-in, CrowdStreet will subordinate its prepetition claims and its DIP Claims and make an additional $2,795,000 loan available to the Liquidating Trust. In all, with sufficient investor opt-in, CrowdStreet will be providing approximately $5 million of value that will stand behind repayment of investors in full.

To the extent that CrowdStreet provides a loan to the Liquidating Trust that is subordinated in repayment to investors, as described above, the terms of the loan are as follows:

To the extent that the Schwartz Nightingale Parties default on their first payment to the Liquidating Trust under the Schwartz Nightingale Settlement, CrowdStreet will make $300,000 (or such lesser amount if there are not sufficient investors that opt-in) available. The remaining amounts that would be available to the Liquidating Trust would be divided into quarterly payments to be paid over eight quarters.

To the extent that the Schwartz Nightingale Parties make their initial payment under the Schwartz Nightingale Settlement, CrowdStreet has agreed to the same amounts as above available to the Liquidating Trust commencing on or after January 1, 2025 over eight quarters.

### 1.10    Projected Recovery of Avoidable Transfers.

The Debtors investigated and will continue to investigate the prepetition transactions involving the Debtors' businesses. However, it is anticipated that the Debtors have significant causes of action against the individuals and entities responsible for the pre-bankruptcy dissipation of the Debtors' respective assets (which almost solely consisted of contributions from equity investors into the Debtors), as well as other actions related to transfers of money pre-petition for little or no benefit to the Debtors. The Debtors' investigation into potential Causes of Action is ongoing and is anticipated to be continued by the Liquidating Trust.

**ARTICLE 2**
**THE PLAN**

The Debtors' Plan must describe how their Creditors will be paid. Certain Claims are entitled to specific treatment under the Bankruptcy Code and are not placed in a class for purpose of payment. For example, Administrative Expenses and Priority Tax Claims are not classified.

As required by the Bankruptcy Code, the Plan places Claims in various classes and describes the treatment each class will receive. The Plan also states whether each class of Claims is impaired or unimpaired. A Claim can be impaired if the Plan alters the legal, equitable or contractual rights to which the Claimants are otherwise entitled. If the Plan is confirmed, each Creditor's recovery is limited to the amount provided in the Plan.

Only Creditors in classes that are impaired may vote on whether to accept or reject the Plan, and only Creditors holding Allowed Claims may vote. A class accepts the Plan when more

than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Allowed Claims that actually vote, vote in favor of the Plan.  Also, a class of Equity Interest Holders accepts the Plan when at least two-thirds (2/3) in amount of the allowed Equity Interest Holders that actually vote, vote in favor of the Plan. A class that is not impaired is deemed to accept the Plan.

### 2.1    Unclassified Claims.

Certain types of Claims are automatically entitled to specific treatment under the Bankruptcy Code. For example, Administrative Expenses and Priority Tax Claims are not classified. They are not considered impaired, and holders of such Claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with the requirements of the Bankruptcy Code. As such, the Plan does not place the following Claims in any class:

### A.    Administrative Expenses.

The Debtors must pay all Administrative Expenses in full. If an Administrative Expense is disputed, the Bankruptcy Court must determine the validity and amount of the Administrative Expense, or in other words, "allow" the Administrative Expense. Any Administrative Expense that is undisputed and is due and owing on the Confirmation Date must be paid in accordance with this Plan, or upon such other terms as agreed upon by the Debtors and the Administrative Claimant or by order of the Bankruptcy Court. If the Administrative Expense is disputed, payment will be made after the Administrative Expense is allowed by the Bankruptcy Court.

There are several types of Administrative Expenses, including the following:

1.      If the Debtors conduct business in the ordinary course following their filing of these Chapter 11 Cases, Creditors are entitled to be paid in full for the goods or services provided. This ordinary trade debt incurred by the Debtors after the Petition Date will be paid on an ongoing basis in accordance with the ordinary business practices and terms between the Debtors and its trade Creditors.

2.      If the Debtors received goods within 20 days prior to the Petition Date which were purchased in the ordinary course of business, the value of the goods received is an Administrative Expense.

3.      Administrative Expenses also include any allowed post-petition fees and expenses of professionals, including the allowed claim of the Chief Restructuring Officer and the Trustee for fees and/or reimbursements, and for attorneys and accountants employed upon Bankruptcy Court authority to render services to the Debtors during the course of these Chapter 11 Cases. Notice of these fees and expenses must be provided to Creditors and approved by the Bankruptcy Court prior to payment.

The following chart lists the Debtors' estimated Administrative Expenses, and their proposed treatment under the Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Expenses arising in the ordinary course of business after the Petition Date | $0.00 | Payment through the Plan as follows: Paid in full in the ordinary course of business. |
| Administrative Tax Claims | $0.00 | Payment through the Plan as follows: Paid in full in the ordinary course of business. |
| Professional fees, as approved by the Bankruptcy Court | $1.5 – 2.0 million | After Bankruptcy Court approval, Payment through the Plan as follows: Paid in full on the Effective Date or as otherwise agreed by the holders of such claims. |
| Clerk's Office fees | $0.00 | Paid in full on the Effective Date. |
| Other Administrative Expenses | $0.00 | Payment through the Plan as follows: paid in full on the Effective Date or as soon as reasonably practicable following entry of an order allowing such claim. |
| Trustee | $25,000-$60,000 | Upon application under section 330 of the Bankruptcy Code and after Bankruptcy Court approval, payment through the Plan as follows: Paid in full on the Effective Date. |
| TOTAL | $1.525- 2.060 million | |

### B.    Priority Tax Claims.

Priority Tax Claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Bankruptcy Code. Unless the holder of such a § 507(a)(8) Priority Tax Claim agrees otherwise, it must receive the present value of such Claim, in regular installments paid over a period not exceeding 5 years from the order of relief.

| Description | Estimated Amount Owed | Treatment |
|---|---|---|
| The Debtors do not believe that any Priority Tax Claims exist but include this class in an abundance of caution to provide a treatment in accordance with the requirements of | $0.00 | Except to the extent that a Holder agrees to a different treatment, each Holder of an Allowed Priority Tax Claim shall receive from the obligated Debtor, in full satisfaction of such Claim, payments equal to the Allowed Amount of such Claim. Allowed Priority Tax Claims will be paid over a period of five years from the Petition Date with interest at the current Federal judgment rate of interest; the payments will be made quarterly. Payments will commence on |

| | | |
|---|---|---|
| the Bankruptcy Code to the extent such claims are later determined to exist. | | the later of the first day of the first full quarter following the Effective Date, or on the first day of the first full quarter following the date that the respective Priority Tax Claim becomes Allowed. |

**2.2    Classes of Claims.**

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

A.    **Classes of Secured Claims.**

Allowed Secured Claims are Claims secured by property of the respective Debtors' bankruptcy estates (or that are subject to setoff) to the extent allowed as secured Claims under section 506 of the Bankruptcy Code. If the value of the collateral or setoffs securing the Allowed Secured Claims is less than the amount of the Allowed Secured Claim, the deficiency will be classified as a general unsecured Claim.

| Class # | Description | Insider? (Yes or No) | Impairment | Treatment |
|---|---|---|---|---|
| 1 | Allowed DIP Claims | No | No | Impaired. Class 1 consists of Allowed DIP Claims. Except for the portion of Allowed DIP Claims that constitute Subordinated DIP Claims, the Allowed DIP Claims shall be paid as soon as the Liquidating Trust has sufficient funds to make such payment as the first priority administrative level expenses of the Liquidating Trust after the Effective Date before payment shall be made to any other creditor or Equity Interest Holder. For the avoidance of doubt, the DIP Lender shall be entitled to agree to a less favorable treatment than that set forth herein.<br><br>Subordinated DIP Claims shall be subordinated for purposes of payment to all other Classes under the Plan and shall be paid only to the extent such other Classes are paid in full. The Subordinated DIP Claims shall be calculated as 10% of the Equity Interests that elect the CS Opt-In (as described herein) determined without counting the CS Fund Investors. For avoidance of doubt, DIP Claims shall only be subject to subordination after any Allowed CS Pre-Petition Claims have been subordinated.<br><br>To the extent (i) the Subordinated DIP Claims plus the Subordinated CS Pre-Petition Claims are greater |

| | | | | than the Allowed DIP Claims plus the Allowed CS Pre-Petition Claims, and (ii) as of the date of any determination there has occurred a payment default by the Schwartz Nightingale Parties under the Schwartz Nightingale Settlement and such default continues to exist and has not been cured after 30 days, the DIP Lender shall make the Liquidating Trust Loan to the Liquidating Trust and such amount shall be treated in the same manner as a Subordinated DIP Claim. Allowed DIP Claims shall accrue interest at a rate of 5.00% per annum as provided under the DIP Loan Documents. Subordinated DIP Claims, and the Liquidating Trust Loan shall accrue interest at the Default Rate as provided in the DIP Documents. |
|---|---|---|---|---|

### B.    Classes of Priority Unsecured Claims.

Certain priority Claims that are referred to in §§ 507(a)(1), (4), (5), (6), and (7) of the Bankruptcy Code are required to be placed in classes. The Bankruptcy Code requires that each holder of such a Claim receive cash on the Effective Date of the Plan equal to the allowed amount of such Claim. However, a class of holders of such Claims may vote to accept different treatment.

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| 2 | Allowed Priority Non-Tax Claims against ONH AFC | No | ONH AFC does not believe that there are any Priority Non-Tax Unsecured Claims Against ONH AFC, but has included this class in an abundance of caution to provide a treatment in accordance with the requirements of the Bankruptcy Code to the extent such claims are later determined to exist.

On or as soon as practicable after the Effective Date, but in no event later than 30 days after the Effective Date, unless otherwise agreed to by the holder of an Priority Non-Tax Claim Against ONH AFC, each holder shall receive, in full and final satisfaction of such Claim, one of the following treatments, in the sole discretion of ONH AFC: (a) full payment in Cash of its Allowed Priority Non-Tax Claim Against ONH AFC; or (b) treatment of its Allowed Priority Non-Tax Claim Against ONH AFC in a manner that leaves such Claim Unimpaired. |

| | | | Class 2 is Unimpaired, and the holders of Allowed Priority Non-Tax Claim Against ONH AFC are conclusively deemed to have accepted the Plan. |
|---|---|---|---|
| 3 | Allowed Priority Non-Tax Claims against ONH 1601 | No | ONH 1601 does not believe that there are any Allowed Priority Non-Tax Unsecured Claims Against ONH 1601, but has included this class in an abundance of caution to provide a treatment in accordance with the requirements of the Bankruptcy Code to the extent such claims are later determined to exist.<br><br>On or as soon as practicable after the Effective Date, but in no event later than 30 days after the Effective Date, unless otherwise agreed to by the holder of an Allowed Priority Non-Tax Claim Against ONH 1601, each holder shall receive, in full and final satisfaction of such Claim, one of the following treatments, in the sole discretion of ONH 1601: (a) full payment in Cash of its Allowed Priority Non-Tax Claim Against ONH 1601; or (b) treatment of its Allowed Priority Non-Tax Claim Against ONH 1601 in a manner that leaves such Claim Unimpaired.<br><br>Class 3 is Unimpaired, and the holders of Allowed Priority Non-Tax Claim Against ONH 1601 are conclusively deemed to have accepted the Plan. |

### C.  <u>Classes of General Unsecured Claims</u>.

General Unsecured Claims are not secured by property of the estate and are not entitled to priority under § 507(a) of the Bankruptcy Code.

The following chart identifies the Plan's proposed treatment of Classes 4 and 5, each of which contains General Unsecured Claims against the Debtors:

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| 4 | General Unsecured Claims against ONH AFC | Impaired | Impaired. This class consists of all General Unsecured Claims against ONH AFC. Except for the Subordinated CS Pre-Petition Claims, each holder of an Allowed General Unsecured Claim against ONH AFC shall receive a Pro Rata Share of Creditor Beneficial Interests in the Liquidating Trust entitling the Holder to payment in full from the Liquidating Trust prior to any distributions to holders of Equity Interests in ONH AFC. |

| | | | |
|---|---|---|---|
| | | | Subordinated CS Pre-Petition Claims shall be subordinated for purposes of payment to all other Classes under the Plan and shall be paid only to the extent such Classes are paid in full as set forth herein. Subordinated CS Pre-Petition Claims shall be calculated as 10% of the Equity Interests that elect the CS Opt-In (as described herein) that exceeds the amount of the DIP Claims. Subordinated CS Pre-Petition Claims shall accrue interest at the Default Rate.<br><br>Each holder of a Class 4 Claim shall have the option of electing to assign all Investor Individual SN Claims it holds to the Liquidating Trust in exchange for 5% annual simple interest on the unpaid amount of such holder's Allowed Class 4 Claim, beginning on the Effective Date and ending on the date of payment, to be paid after recovery of its Allowed Class 4 Claim (the "SN Opt-In"); provided however that any election for a Class 4 Claim that is reclassified as a Class 6 Claim shall be treated as being made in Class 6.<br><br>Each holder of a Class 4 Claim shall have the option to opt-in to the CS Release in exchange for CrowdStreet's agreement described in this Plan to subordinate certain of its claims and make available the Liquidating Trust Loan, as described in Section 2.5.D.2 below.<br><br>To opt-in to the CS Opt-In, the holder should check the appropriate "CS OPT-IN" box on its Ballot.<br><br>To opt-in to the SN Opt-In, the holder should check the appropriate "SN OPT-IN" box on its Ballot. |
| 5 | General Unsecured Claims against ONH 1601 | Impaired | Impaired. This class consists of all General Unsecured Claims against ONH 1601. Except for the Subordinated CS Pre-Petition Claims, each holder of an Allowed General Unsecured Claim against ONH 1601 shall receive a Pro Rata Share of Creditor Beneficial Interests in the Liquidating Trust entitling the Holder to payment in full from the Liquidating Trust prior to any distributions to holders of Equity Interests in ONH 1601.<br><br>Subordinated CS Pre-Petition Claims shall be subordinated for purposes of payment to all other Classes under the Plan and shall be paid only to the extent such Classes are paid in full as set forth herein. Subordinated CS Pre-Petition Claims shall be calculated as 10% of the Equity Interests that elect the CS Opt-In (as described herein) that exceeds the amount of the DIP Claims. |

|  |  |  | Each holder of a Class 5 Claim shall have the option of electing to assign all Investor Individual SN Claims it holds to the Liquidating Trust in exchange for 5% annual simple interest on the unpaid amount of such holder's Allowed Class 5 Claim, beginning on the Effective Date and ending on the date of payment, to be paid after recovery of its Allowed Class 5 Claim; provided however that any election for a Class 5 Claim that is reclassified as a Class 7 Claim shall be treated as being made in Class 7.<br><br>Each holder of a Class 5 Claim shall have the option to opt-in to the CS Release in exchange for CrowdStreet's agreement described in this Plan to subordinate certain of its claims and make available the Liquidating Trust Loan, as described in Section 2.5.D.2 below.<br><br>To opt-in to the CS Opt-In, the holder should check the appropriate "CS OPT-IN" box on its Ballot.<br><br>To opt-in to the SN Opt-In, the holder should check the appropriate "SN OPT-IN" box on its Ballot. |

### D.     Classes of Equity Interest Holders.

Equity Interest Holders are parties who hold an ownership interest (i.e., an equity interest) in the Debtors. Because the Debtors are limited liability companies, Equity Interest Holders are members of the Debtors.

The following chart sets forth the Plan's proposed treatment of the classes of Equity Interest Holders.

| Class # | Description | Impairment | Treatment |
|---------|-------------|------------|-----------|
| 6 | Equity Interests in ONH AFC and Section 510(b) Subordinated Claims | Yes | Impaired. Each holder of an Allowed Equity Interest in ONH AFC or a Section 510(b) Subordinated Claim in ONH AFC shall receive a Pro Rata Share of Equity Beneficial Interests in the Liquidating Trust entitling the Holder to a pro rata share of all Liquidating Trust Assets remaining after payment of all other amounts required to be paid under the Plan.<br><br>Each holder of an Equity Interest in ONH AFC or a Section 510(b) Subordinated Claim in ONH AFC shall have the option of electing to assign all Investor Individual SN Claims it holds to the Liquidating Trust in exchange for 5% annual simple interest on the unpaid amount of such holder's Equity Interest, beginning on the Effective Date and ending on the date of |

payment, to be paid after recovery of its Equity Interest (the "SN Opt-In").

ONH AFC believes that each person or entity that made an equity investment into ONH AFC should be classified and receive the same treatment under the Plan as other Claims in Class 6. For any proof of claim filed by an investor asserting a creditor claim (rather than an equity interest), ONH AFC intends to (i) seek an agreement with such investor to have its claim receive the treatment specified by this Plan for Claims in Class 6 or (ii) file an objection under Bankruptcy Code Section 510(b) or otherwise request that the Bankruptcy Court treat such claim as a Class 6 Claim.

Each holder of a Class 6 Claim shall have the option to opt-in to the CS Release in exchange for CrowdStreet's agreement described in this Plan to subordinate certain of its claims and make available the Liquidating Trust Loan, as described in Section 2.5.D.2 below.

To opt-in to the CS Opt-In, the holder should check the appropriate "CS OPT-IN" box on its Ballot.

To opt-in to the SN Opt-In, the holder should check the appropriate "SN OPT-IN" box on its Ballot.

| 7 | Equity Interests in ONH 1601 and Section 510(b) Subordinated Claims | Yes | Impaired. Each holder of an Allowed Equity Interest in ONH 1601 or a Section 510(b) Subordinated Claim in ONH 1601 shall receive a Pro Rata Share of Equity Beneficial Interests in the Liquidating Trust entitling the Holder to a pro rata share of all Liquidating Trust Assets after payment of all other amounts required to be paid under the Plan. |
|---|---|---|---|

Each holder of an Equity Interest in ONH 1601 or a Section 510(b) Subordinated Claim in ONH 1601 shall have the option of electing to participate in the SN Opt-In by assigning all Investor Individual Claims it holds to the Liquidating Trust in exchange for 5% annual simple interest to be paid after recovery of its Equity Interest.

ONH 1601 believes that each person or entity that made an equity investment into ONH 1601 should be classified and treated in Class 7. For any proof of claim filed by an investor asserting a creditor claim (rather than an equity interest), ONH AFC intends to (i) seek an agreement with such investor to have its claim receive the same treatment under the Plan as shall be given to other Claims in Class 7 or (ii) file an objection under

| | | | Bankruptcy Code Section 510(b) or otherwise request that the Bankruptcy Court treat such claim as Class 7 Claim. |
| | | | Each holder of a Class 7 Claim shall have the option to opt-in to the CS Release in exchange for CrowdStreet's agreement described in this Plan to subordinate certain of its claims and make available the Liquidating Trust Loan, as described in Section 2.5.D.2 below. |
| | | | To opt-in to the CS Opt-In, the holder should check the appropriate "CS OPT-IN" box on its Ballot. |
| | | | To opt-in to the SN Opt-In, the holder should check the appropriate "SN OPT-IN" box on its Ballot. |

### 2.3    Estimated Number and Amount of Claims Objections.

The Debtors or the Liquidating Trust, as the case may be, may object to the amount of validity of any Claim or Interest within 180 days of the Confirmation Date by filing an objection with the Bankruptcy Court and serving a copy of the objection on the holder of the Claim or Interest. The Claim or Interest objected to will be treated as a Disputed Claim under the Plan. If and when a Disputed Claim is finally resolved by the allowance of the Claim or Interest in whole or in part, the Debtors will pay the Allowed Claim or Interest in accordance with the Plan.

As set forth above, the Debtors believe that each person or entity that made an equity investment into ONH 1601 or ONH AFC should be classified as and receive the same treatment under the Plan as the holders of Equity Interests in the Debtors (i.e., the treatment proposed for Claims in Classes 6 or 7). For any proof of claim filed by an investor asserting a creditor claim (rather than an equity interest) against ONH 1601 or ONH AFC, the Debtors intend to (i) seek an agreement with such investor to have its claim receive the same treatment as a Claim in Classes 6 or 7 or (ii) file an objection under section 510(b) of the Bankruptcy Code or another applicable section thereof or otherwise request that the Bankruptcy Court treat such claim as a Class 6 or 7 Claim.

### 2.4    Treatment of Executory Contracts and Unexpired Leases.

Executory Contracts are contracts where significant performance of the contract remains due for both the Debtors and the counterparties to the applicable contract. The Debtors have the right to reject, assume (i.e. accept), or assume and assign these types of contracts to another party, subject to the Bankruptcy Court's approval. The paragraphs below explain the respective Debtors' proposed treatment of their Executory Contracts (which includes their unexpired leases) under the Plan.

**Rejection of Executory Contracts and Unexpired Leases.**

Upon the occurrence of the Effective Date, the Debtors shall be conclusively deemed to have rejected all executory contracts and/or unexpired leases as of the Effective Date (except for any executory contracts with professionals that have been approved by the Bankruptcy Court).

"Rejection," in this context, means that the applicable Debtor has elected not to continue to perform the obligations under such contracts or leases. If the Debtors have elected to reject a contract or lease, the other party to the contract or lease will be treated as an unsecured Creditor holding a Claim that arose prior to the Petition Date.

**THE DEADLINE FOR FILING A PROOF OF CLAIM BASED ON A CLAIM ARISING FROM THE REJECTION OF AN EXECUTORY CONTRACT IS THIRTY (30) DAYS AFTER THE EFFECTIVE DATE.** Any Claim based on the rejection of an Executory Contract will be barred if the proof of claim is not timely filed, unless the Bankruptcy Court orders otherwise.

### 2.5    Means for Implementation of the Plan.

**A.    General Overview of the Plan**.  The purpose of the Plan is to provide for the monetization of the Debtors' respective Assets and to distribute the net proceeds to the Holders of Claims and Interests against each respective Debtor.  To accomplish this, the Plan contemplates the creation of the Liquidating Trust operated by the Liquidating Trustee in consultation with the Liquidating Trust Committee. On the Effective Date of the Plan, the Debtors' respective Assets will be vested in the Liquidating Trust, which will liquidate such assets in an orderly fashion for the benefit of the Debtors' respective Creditors and holders of Equity Interests. Upon the Effective Date, all Equity Interests in the Debtors will be cancelled.

**B.    No Substantive Consolidation of the Debtors**. The Plan shall not effect the substantive consolidation of the Debtors. The Liquidating Trustee shall be responsible for accounting for each Debtors' portion of the Liquidating Trust Assets. For the avoidance of doubt, any provision of the Plan referencing payment from the Liquidating Trust Assets shall refer to payment to a Holder of an Allowed Claim or Interest solely from the Liquidating Trust Assets attributable to the applicable Debtor.

**C.    Allocation of Sale and Settlement Proceeds and Interests Between Debtors.**

I.    **Allocation of 1601 Sale Proceeds.** The 1601 Sale Proceeds shall be divided equally between the Debtors' bankruptcy estates. Both the Debtors' Subscription Agreements and Operating Agreements provide that Delaware law applies to dispute arising from those agreements.[5] Based on the Debtors' investigation, the Debtors are similarly situated with potential claims and causes of action against the Buyer of Lincoln Place and the Lincoln Place property itself (as defined in the 1601 Motion). As a matter of law, ONH 1601 does not have greater rights to the Lincoln Place real property than ONH

---

[5] "Property interests are created and defined by state law." *Butner v. United States*, 440 U.S. 48, 55, 99 S. Ct. 914, 918, 59 L. Ed. 2d 136 (1979).

AFC because ONH 1601 has no specific right to or in the Lincoln Place real property itself. The Debtors would only have a specific right to the Lincoln Place property if they had or contracted for a direct interest in the real property.[6] In this case, the Debtors only had a right to invest in the property-owning companies subject to a transaction that did not close. The releases described in the 1601 Motion are to be given only by the Debtors, in favor of the Buyer and Lincoln Place, in exchange for the 1601 Sale Proceeds, if certain conditions are met. Because the Debtors are similarly situated with respect to their potential claims against the Buyer and Lincoln Place and each are releasing those potential claims and causes of action against the Buyer and Lincoln Place, the allocation of the 1601 Sale Proceeds shall be divided equally among the Debtors' bankruptcy estates.

II.  **Allocation of Schwartz Nightingale Settlement Proceeds**: The Schwartz Nightingale Settlement provides that the Schwartz Nightingale Parties shall pay the Debtors an Aggregate Repayment Amount (as defined in the Schwartz Nightingale Settlement) that will be calculated using the formula provided in the Schwartz Nightingale Settlement. The entirety of the Schwartz Nightingale Settlement is subject to Bankruptcy Court approval. The formula considers the amounts invested in each Debtor and the expenses of the Debtors or Liquidating Trust to calculate the total amount to be paid by the Schwartz Nightingale Parties, regardless of which individual Debtor received the investment. Accordingly, the proceeds of the Schwartz Nightingale Settlement shall be divided and distributed on a *pro rata* basis based on the amounts invested in each individual Debtor that remain unpaid as provided in the Plan and Liquidating Trust Agreement.

### D.    Two Elections for Holders of Equity Interests

1.    **The SN Opt-In.**  Each holder of an Equity Interest in a Debtor or a Section 510(b) Subordinated Claim in a Debtor shall have the option of electing to assign all Investor Individual SN Claims it holds to the Liquidating Trust in exchange for 5% annual simple interest on the unpaid amount of such holder's Equity Interest, beginning on the Effective Date and ending on the date of payment, to be paid after recovery of its Equity Interest. To opt-in to the SN Opt-In, the holder should check the appropriate "OPT-IN" box on its Ballot. **To the extent that any holder of Equity Interest elects the SN Opt-In, such holder is deemed to assign to the Liquidating Trust any and all claims and causes of action from the beginning of time to the Effective Date relating in any way to the Debtors against Schwartz Nightingale Parties or anyone acting on its behalf.**

---

[6] *See, e.g., Nobe Bay Holdings, LLC v. Garcia*, 140 So.3d 693, 695 (Fla. 3d Dist. Ct. App. 2014) (when agreement provides for no direct claim against subject property, *lis pendens* is inappropriate).

2.      **The CS Opt-In.** Each holder of an Equity Interest in a Debtor or a Section 510(b) Subordinated Claim in a Debtor shall have the option of electing to opt-in to the CS Release in exchange for CrowdStreet's agreement described in this Plan to subordinate certain of its claims and make available the Liquidating Trust Loan. To opt-in to the CS Opt-In, the holder should check the appropriate "OPT-IN" box on its Ballot. **To the extent that any holder of an Equity Interest elects the CS Opt-In, such holder is deemed to release any and all claims and causes of action from the beginning of time to the Effective Date relating in any way to the Debtors against CrowdStreet or its affiliates, or anyone acting on its behalf.**

E.      **Transfers of Property to the Liquidating Trust.** On the Effective Date, the Debtors shall be deemed to have irrevocably transferred and assigned the Liquidating Trust Assets to the Liquidating Trust, to hold in trust for the benefit of the Holders of Allowed Claims and Interests against the respective Debtors, pursuant to the terms of this Plan and of the Liquidating Trust Agreement.

Except as otherwise provided by the Plan or the Liquidating Trust Agreement, upon the Effective Date, title to the Liquidating Trust Assets shall pass to the Liquidating Trust free and clear of all Claims and Equity Interests, in accordance with section 1141 of the Bankruptcy Code, except for validly perfected liens on Liquidating Trust Assets, which shall continue to encumber the Liquidating Trust Assets to the same validity, extent, and priority as existed prior to the Effective Date. For the avoidance of doubt, it is the intent of this section that all assets of the Debtors be transferred to the Liquidating Trust, and that after the Effective Date, the Debtors will retain no assets of any nature whatsoever.

F.      **Dissolution of the Debtors.** Sixty (60) days after the Effective Date, the Debtors shall be deemed dissolved unless the Liquidating Trustee files a Notice of Continued Existence with respect to such Debtor with the Bankruptcy Court, in which case such Debtor shall continue to exist until dissolved under otherwise applicable law.

G.      **The Liquidating Trust**.

1.      Formation of the Liquidating Trust. On the Effective Date, the Liquidating Trust Agreement shall be executed by the Debtors and Liquidating Trustee, and all other necessary steps shall be taken to establish the Liquidating Trust for the benefit of holders of Claims and Interests. A copy of the Liquidating Trust Agreement will be included in the Plan Supplement.

2.      Material Terms of Liquidating Trust Agreement. The following provisions are intended to summarize the material terms of the Liquidating Trust Agreement, which shall control the formation, operations, and dissolution of the Liquidating Trust. In the event of a conflict between the terms of this section and the terms of the Liquidating Trust Agreement, the Liquidating Trust Agreement shall control.

(1)      Purpose of Liquidating Trust. The Liquidating Trust shall be established for the sole purpose of liquidating and distributing the Liquidating Trust Assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the pursuit of a trade or business.

(2)     <u>The Liquidating Trustee</u>. The Liquidating Trustee shall be Ms. Anna Phillips. The Debtors' designation of the Liquidating Trustee shall be effective as of the Effective Date without the need for further order of the Bankruptcy Court. The Liquidating Trustee's removal provisions in the Liquidating Trust Agreement shall be the same as those contained in the Operating Agreements.

(3)     <u>Authority of the Liquidating Trustee</u>.  Subject only to the limitations contained in the Plan or the Liquidating Trust Agreement, the Liquidating Trustee shall have, by way of illustration and not limitation, the following duties, responsibilities, authorities, and powers: (A) the power and authority to hold, manage, sell, and distribute Liquidating Trust Assets in accordance with the Plan; (B) the power and authority to prosecute and resolve objections to Claims or Interests against the Debtors that are payable from the Liquidating Trust; (C) the power and authority to perform such other functions as are provided in the Plan and Liquidating Trust Agreement; and (D) any other act the Liquidating Trustee deems in the best interest of the Liquidating Trust.

(4)     <u>Governance of Liquidating Trust</u>. The Liquidating Trust shall be governed in accordance with the Liquidating Trust Agreement and consistent with the Plan.

(5)     <u>Liquidating Trust Committee</u>. The Liquidating Trust shall be administered by the Liquidating Trustee in accordance with the Liquidating Trust Agreement and subject to the oversight of the Liquidating Trust Committee.

(6)     <u>Distributions of Liquidating Trust Assets</u>.  The Liquidating Trustee shall be responsible for making distributions from the Liquidating Trust as provided in the Plan and Liquidating Trust Agreement. Any Liquidating Trust Assets available for distribution shall be applied (a) first, to pay or reimburse, as applicable, the reasonable, documented out of pocket fees, costs, expenses, and liabilities of the Liquidating Trust and Liquidating Trustee applicable to such Debtor, (b) second, to distributions to holders of Beneficial Interests related to such Debtor.

(7)     <u>Retention and Compensation of Liquidating Trustee and Professionals</u>. The Liquidating Trustee may retain counsel and other professionals to assist in carrying out and otherwise performing the Liquidating Trustee's duties on such terms as the Liquidating Trustee deems appropriate as set forth in the Liquidating Trust Agreement. The Liquidating Trust and its retained professionals (if any) shall be entitled to reasonable compensation from the Liquidating Trust as set forth in the Liquidating Trust Agreement.

(8)     <u>Dissolution</u>. The Liquidating Trust and Liquidating Trustee shall be discharged or dissolved, as the case may be, at such time as all distributions required to be made by the Liquidating Trust under the Plan have been made, but in no event shall the Liquidating Trust be dissolved later than five (5) years from the Effective Date, absent Bankruptcy Court approval.

(9)     <u>Indemnification of Liquidating Trustee</u>.  The Liquidating Trustee and her agents and professionals shall not be liable for actions taken or omitted

in their capacity as, or on behalf of, the Liquidating Trust or Liquidating Trustee, except for those acts arising primarily and directly out of its or their own willful misconduct, gross negligence, or bad faith, and each shall be entitled to indemnification and reimbursement for fees and expenses incurred in defending any and all of its actions or inactions in its capacity as, or on behalf of, the Liquidating Trust or Liquidating Trustee.  Any indemnification claim of the Liquidating Trustee, her agents or professionals, shall be satisfied from the Liquidating Trust as such costs or expenses are incurred.  The Liquidating Trustee shall be entitled to rely, in good faith, on the advice of her retained professionals.

### H.    Preservation of Causes of Action.

1.    On the Effective Date, all Causes of Action shall be vested exclusively in the Liquidating Trust except to the extent a Creditor other third party has, prior to the Effective Date, been specifically released from any Cause of Action by the terms of the Plan or by a Final Order of the Bankruptcy Court. The Liquidating Trust will have the rights, powers, and privileges to pursue, not pursue, settle, release, or enforce any Causes of Action without seeking approval from the Bankruptcy Court, provided, however, that the Liquidating Trustee may seek Bankruptcy Court intervention and/or approval for any reason. The Debtors are currently not in a position to express an opinion on the merits of any of the Causes of Action or on the recoverability of any amounts as a result of any such Causes of Action. Any Person that engaged in business or other transactions with the Debtors prior to the Petition Date or that received payments from the Debtors prior to the Petition Date may be subject to litigation to the extent that applicable bankruptcy or non-bankruptcy law supports such litigation.

2.    No Creditor, holder of an Interest, or other Person should vote for the Plan or otherwise rely on Confirmation of the Plan or the entry of the Confirmation Order in order to obtain, or on the belief that it will obtain, any defense to any Cause of Action.  No Creditor or other party should act or refrain from acting on the belief that it will obtain any defense to any Cause of Action. SUBJECT TO THE SCHWARTZ NIGHTINGALE SETTLEMENT, THE PLAN DOES NOT, AND IS NOT INTENDED TO, RELEASE ANY CAUSES OF ACTION OR OBJECTIONS TO CLAIMS, AND ALL SUCH RIGHTS ARE SPECIFICALLY RESERVED IN FAVOR OF THE LIQUIDATING TRUST. All parties in interest are advised that legal rights, claims, and rights of action the Debtors may have against them, if they exist, are retained under the Plan for prosecution unless a specific order of the Bankruptcy Court authorizes the Debtors to release such claims.  As such, parties in interest are cautioned not to rely on (i) the absence of the listing of any legal right, claim, or Cause of Action against a particular Creditor in the Plan, or the Schedules or (ii) the absence of litigation or demand prior to the Effective Date of the Plan as any indication that the Debtors or the Liquidating Trust does not possess or does not intend to prosecute a particular claim or Cause of Action if a particular Creditor or holder of an Interest votes to accept the Plan.  IT IS THE EXPRESS INTENTION OF THE PLAN TO PRESERVE RIGHTS, CLAIMS, AND CAUSES OF ACTION OF THE DEBTORS, WHETHER NOW KNOWN OR UNKNOWN, FOR THE BENEFIT OF THE LIQUIDATING TRUST, SUBJECT TO THE SCHWARTZ NIGHTINGALE SETTLEMENT.  To the fullest extent allowed under applicable law, nothing in the Plan operates as a release of any Cause of Action, except as expressly provided otherwise or provided in the Schwartz Nightingale Settlement, nor shall the Debtors' failure to describe with specificity any Cause of Action estop or preclude the Liquidating Trust from pursuing such Causes of Action.

3.     Notwithstanding the foregoing, the Debtors have made a good faith effort to identify and disclose known Causes of Action. A schedule identifying the Debtors' known Causes of Action to be transferred and retained by the Liquidating Trust are attached hereto as **Exhibit 1**.

**I.     Effectiveness of Securities, Instruments, and Agreements.** On the Effective Date, all documents or agreements entered into or documents issued pursuant to the Plan or in connection with the Plan shall become effective and binding upon the parties thereto in accordance with their respective terms and conditions and shall be deemed to become effective simultaneously.

**J.     Effectuating Documents and Further Transactions.** The Debtors and the Liquidating Trust are authorized and directed to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**2.6     Payments**.

Payments to Creditors and holders of Interests provided for in the Plan will be made by the Liquidating Trustee.

**2.7     Post-Confirmation Management.**

The Debtors will not continue in business after the Effective Date.  The Liquidating Trust shall be managed by the Liquidating Trustee.

**2.8     Tax Consequences of the Plan.**

***Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, and/or Advisors.***

The following is a summary of certain United States ("U.S.") federal income tax consequences of the Plan for certain holders of Allowed Claims. This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations thereunder ("Treasury Regulations"), and administrative and judicial interpretations, all as in effect on the date hereof (collectively, "Applicable U.S. Tax Law"). Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained and the Debtor does not intend to seek a ruling from the Internal Revenue Service (the "IRS") as to any of the tax consequences of the Plan discussed below.  The discussion below is not binding upon the IRS or the courts.  There can be no assurance that the IRS will not challenge one or more of the U.S. federal income tax consequences of the Plan described below.

This summary does not address non-U.S., state, local or non-income tax consequences of the Plan (including such consequences with respect to the Debtors). This summary does not apply

to holders of a Claim that are not United States persons, as such term is defined in the Internal Revenue Code ("Non-U.S. Holders"), nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as persons who are related to the Debtors within the meaning of the Tax Code, persons liable for alternative minimum tax, U.S. Holders whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, controlled foreign corporations, passive foreign investment companies, partnerships (or other entities treated as partnerships or other pass-through entities), beneficial owners of partnerships (or other entities treated as partnerships or other pass-through entities), subchapter S corporations, persons who hold Claims or who will hold any consideration received pursuant to the Plan as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders of Claims who are themselves in bankruptcy). Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that Claims will be treated in accordance with their form for U.S. federal income tax purposes. The U.S. federal income tax consequences of the implementation of the Plan to the Debtor and Holders of Claims described below also may vary depending on the nature of any Restructuring Transactions that the Debtor engaged in.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner and the entity. Partners (or other beneficial owners) of partnerships (or other entities treated as partnerships or other pass-through entities) that are Holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.

ALL HOLDERS OF ALLOWED CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

### 2.9    Certain U.S. Federal Income Tax Consequences to holders of General Unsecured Claims.

Because Holders of General Unsecured Claims are expected to receive nothing but Cash in satisfaction of their Claims, such Holders will be treated as receiving their distribution under the Plan in taxable exchange under section 1001 of the Tax Code. Accordingly, other than with respect to any amounts received that are attributable to accrued but untaxed interest (or OID), a U.S. Holder of such a claim would recognize gain or loss equal to the difference between (a) the sum of the Cash and the fair market value (or issue price, in the case of debt instruments) of the consideration received and (b) such U.S. Holder's adjusted basis in such Claim. See discussion below regarding the extent to which any consideration should be treated as attributable to accrued interest (or OID).

### A.    Disputed Ownership Fund Treatment.

Certain proceeds from the disposition of the Debtors' assets may be deposited into an account pending the resolution of disputed claims. The Debtors intend that such assets will be subject to disputed ownership fund treatment under Section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes). To the extent property is not distributed to U.S. Holders of applicable Claims on the Effective Date but, instead, is transferred to any such account, although not free from doubt, U.S. Holders should not recognize any gain or loss on the date that the property is so transferred. Instead, gain or loss should be recognized when and to the extent property is actually distributed to such U.S. Holders.

To the extent that a U.S. Holder receives distributions with respect to a Claim subsequent to the Effective Date, such U.S. Holder may recognize additional gain (if such U.S. Holder is in a gain position), and a portion of such distribution may be treated as imputed interest income.  In addition, it is possible that the recognition of any loss realized by a U.S. Holder may be deferred until all payments have been made out of any such account.  U.S. Holders are urged to consult their tax advisors regarding the possible application (and the ability to elect out) of the "installment method" of reporting any gain that may be recognized by such U.S. Holders in respect of their Claims due to the receipt of property in a taxable year subsequent to the taxable year in which the Effective Date occurs.  The discussion herein assumes that the installment method does not apply.

### B.    Accrued Interest and OID.

A portion of the consideration received by Holders of Allowed Claims may be attributable to accrued interest or OID on such Claims. Such amounts should be taxable to that U.S. Holder as interest income if such accrued interest or OID has not been previously included in the Holder's gross income for U.S. federal income tax purposes. Conversely, U.S. Holders of Claims may be able to recognize a deductible loss to the extent any accrued interest or OID on the Claims was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. If the fair value of the consideration is not sufficient to fully satisfy all principal and interest or OID on Allowed Claims, the extent to which such consideration will be attributable to accrued interest or OID is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest or OID that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan is binding for U.S. federal income tax purposes, while certain Treasury Regulations generally treat payments as allocated first to any accrued but unpaid interest or OID and then as a payment of principal. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan.

### C.   Market Discount.

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for an amount may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a *de minimis* amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of Allowed Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claims were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

### D.   Medicare Tax on Net Investment Income.

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8% tax on, among other things, interest, dividends and gains from the sale or other disposition of capital assets.  U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of consideration received pursuant to the Plan.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

**2.10    Projections in Support of Debtors' Ability to Make Payments Under the Proposed Plan**.

The Debtors estimate there will be minimal or no payments required for the Effective Date to occur. Thereafter, the ultimate amount and timing of distributions from the Liquidating Trust to Creditors and Equity Interest Holders will be determined at a future date based on, among other things, the results of the Investor Opt-In Process and the Liquidating Trust's ability to monetize the Liquidating Trust Assets (primarily Causes of Action). Due to the uncertain nature of such litigation, it is impossible to predict the timing and amount of such distributions.

## ARTICLE 3
## FEASIBILITY OF PLAN

The Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor, unless such liquidation or reorganization is proposed in the Plan.

### 3.1    Ability to Initially Fund Plan.

As set forth in Section 2.10, the Debtors believe that they will have enough cash on hand on the Effective Date of the Plan to pay all the Claims and expenses that are entitled to be paid pursuant to the Plan.

### 3.2    Ability to Make Future Plan Payments and Operate Without Further Reorganization.

This Plan contemplates the liquidation of the Debtors' Assets for the benefit of their respective Creditors and Equity Interest Holders. At this time, it is unknown how much money will be generated by the liquidation of such assets, and Debtors are unable to estimate with reasonable specificity the projected distributions under the Plan.

## ARTICLE 4
## LIQUIDATION ANALYSIS

To confirm the Plan, the Bankruptcy Court must find that all Holders of Claims against the Debtors who do not vote to accept the Plan will receive at least as much under the Plan as such

Holders would receive in a Chapter 7 liquidation. Due to the increased costs that will result from the liquidation of the Debtors' assets under Chapter 7 of the Bankruptcy Code, the Debtors believe that the best interests test is satisfied under the circumstances.

To determine what recovery, if any, the holders of Claims and Interests against the Debtors would receive if the Debtors are liquidated, the Court must determine how the assets and properties of the Debtors would be liquidated and distributed in the context of Chapter 7 liquidation cases.

The Debtors' cost of liquidation under Chapter 7 cases would include the fees payable to a trustee in bankruptcy and to any additional attorneys and other professionals engaged by such trustee as well as any unpaid expenses incurred by the Debtors during these Chapter 11 Cases prior to conversion, including compensation of attorneys and accountants. The additional costs and expenses incurred by a trustee in a Chapter 7 liquidation could be substantial and would decrease the possibility that Unsecured Creditors would receive meaningful distributions. This is particularly the case where the Debtors are engaged or will engage in ongoing litigation with third parties. The trustee and her professionals will need to review and analyze complex agreements and statutory provisions which would likely result in significant cost to the Debtors' estates. The foregoing types of Claims arising from Chapter 7 administration and such other Claims as may arise in Chapter 7 or result from these pending Chapter 11 Cases would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay the Claims of Unsecured Creditors. Additionally, liquidation in Chapter 7 might substantially delay the date at which Creditors would receive any payment.

The Debtors have carefully considered the probable effects of liquidation under Chapter 7 on the ultimate proceeds available for distribution to Creditors and holders of Interests, including the following: (a) the possible costs and expenses of the Chapter 7 trustee or trustees and their professionals; and (b) the possible substantial increase in Claims, which would have priority over or on parity with those of Unsecured Creditors. After review of all of the above-referenced considerations, the Debtors believe that the best interests test is satisfied under the circumstances.

## ARTICLE 5
## NO DISCHARGE OF DEBTORS

### 5.1     No Discharge.

In accordance with Section 1141(d)(3) of the Bankruptcy Code, the Debtors will not receive any discharge of debt in these Chapter 11 Cases.

## ARTICLE 6
## GENERAL PROVISIONS

### 6.1     Title to Assets.

If a plan is confirmed under § 1191(a), except as otherwise provided in the Plan or in the order confirming the Plan, (i) confirmation of the Plan vests all of the property of the estate in the Reorganized Debtors, and (ii) after confirmation of the Plan, the property dealt with by the Plan is free and clear of all Claims of Creditors, equity security holders, and of general partners in the Debtors.

If a plan is confirmed under § 1191(b), property of the estate includes, in addition to the property specified in § 541, all property of the kind specified in that section that the Debtors acquire, as well as earnings from services performed by the Debtors, after the Petition Date but before these Chapter 11 Cases are closed, dismissed, or converted to a case in § 1185 of the Bankruptcy Code, the Plan, or the order confirming the Plan, the Debtors shall remain in possession of all property of the estate.

### 6.2    **Binding Effect**.

If the Plan is confirmed, the provisions of the Plan will bind the Debtors and all Creditors and Equity Interest Holders, whether or not they vote to accept the Plan. The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of the successors or assigns of such entity.

### 6.3    **Severability**.

If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

### 6.4    **Retention of Jurisdiction by the Bankruptcy Court**.

The Bankruptcy Court shall retain jurisdiction of these Chapter 11 Cases with regard to the following matters: (i) to make such orders as are necessary or appropriate to implement the provisions of this Plan and to resolve any disputes arising from implementation of the Plan; (ii) to rule on any modification of the Plan proposed under section 1193; (iii) to hear and allow all applications for compensation to professionals and other Administrative Expenses; (iv) to resolve all issues regarding Claims objections, and issues arising from the assumption/rejection of executory contracts or unexpired leases, and (v) to adjudicate any cause of action which may exist in favor of the Debtors, including preference and fraudulent transfer causes of action.

### 6.5    **Captions**.

The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

### 6.6    **Modification of Plan**.

The Debtors may modify the Plan at any time before confirmation of the Plan pursuant to § 1193(a). However, the Bankruptcy Court may require additional items including revoting on the Plan.

If the Plan is confirmed under Section 1191(a), the Debtors may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated *and* (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

If the Plan is confirmed under Section 1191(b), the Debtors may seek to modify the Plan at any time only if (1) it is within 3 years of the Confirmation Date, or such longer time not to

exceed 5 years as fixed by the court *and* (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

### 6.7    Final Decree.

Once the Debtors' estates have been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Debtors, or such other party as the Bankruptcy Court shall designate in the Confirmation Order, shall file a motion with the Bankruptcy Court to obtain a final decree to close the case. Alternatively, the Bankruptcy Court may enter such a final decree on its own motion.

### 6.8    Provisions Governing Distributions.

**A.    Delivery of Distributions.**  Unless otherwise provided in the Plan, all distributions to any holder of an Allowed Claim or Interest will be made to the holder of each Allowed Claim or Interest at the address of such holder as listed in the Schedules and Statements, or on the books and records of the Debtors or their agents unless the Debtors or Liquidating Trust have been notified, in advance, in writing of a change of address, including, without limitation, by the timely filing of a proof of claim by such holder that provides for an address for such holder different from the address reflected in the Schedules or in the Debtors' books and records.

**B.    Unclaimed Distributions.**  A Distribution that is not claimed by a holder of an Allowed Claim or Allowed Equity Interest on or before 90 days from the date the Debtors or Liquidating Trustee, as applicable, makes such Distribution shall be deemed an "unclaimed distributions."  Unclaimed distributions shall revert to the Debtor or Liquidating Trust that attempted to make the distribution.

**C.    Minimum Distributions.**  No payment of Cash less than $50 shall be made by the Debtors or Liquidating Trust, and any payment required to be made hereunder that would total less than $50 shall be deemed waived.

### 6.9    Exculpation.

**Neither the Debtors nor any of their officers, directors, employees, advisors, professionals, independent contractors, or agents, (collectively, "Exculpation Parties") shall have any liability to any entity for any and all claims, causes of action and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, at equity, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances taking place or arising from and after the Petition Date and prior to the Effective Date related in any way to the Debtors, including, without limitation, those that any of the Debtors would have been legally entitled to assert or that any Holder of a Claim or Interest or other entity would have been legally entitled to assert for or on behalf of any of the Debtors or the bankruptcy estates and further including those in any way related to the Chapter 11 Cases, Liquidating Trust Agreement or this Plan, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the**

**Plan, the post-petition debtor-in-possession financing approved by the Bankruptcy Court, the Liquidating Trust Agreement, or any other contract, instrument, release or other agreement or document created or entered into in connection with this Plan or any other post-petition act taken or omitted to be taken in connection with the Debtors; <u>provided</u>, <u>however</u>, the foregoing provisions of this section shall have no effect on the liability of any entity that arises primarily and directly from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.**

**6.10   <u>Injunction</u>.**

**UPON ENTRY OF THE CONFIRMATION ORDER, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS AND OTHER PARTIES IN INTEREST, ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AND AFFILIATES, SHALL BE ENJOINED FROM TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN.**

**6.11   <u>Revocation of Withdrawal of Plan</u>.**

The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date.  If the Debtors take such action, the Plan shall be deemed null and void.

**6.12   <u>Governing Law</u>.**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of (a) the State of Delaware shall govern the construction and implementation hereof and any agreements, documents, and instruments executed in connection with this Plan and (b) the laws of the state of incorporation or organization of the Debtors shall govern corporate or other governance matters with respect to such Debtors, in either case without giving effect to the principles of conflicts of law thereof.

**6.13   <u>Exemption from Transfer Taxes</u>.**

Subject to orders entered by the Bankruptcy Court prior to the Confirmation Date authorizing certain sales of real property, pursuant to section 1146(c) of the Bankruptcy Code, the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition of assets contemplated by the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, sales, use, or other similar tax.

**6.14   <u>Successors and Assigns</u>.**

All the rights, benefits, and obligations of any person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and/or assigns of such person.

**6.15   <u>Entire Agreement</u>.**

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

## ARTICLE 7
## ATTACHMENTS

The following documents accompany the Plan:

[X]     Causes of Action to be Transferred to Liquidating Trust, annexed as **Exhibit 1**.

[X]     Copy of the Schwartz Nightingale Settlement, annexed as **Exhibit 2**.

## ARTICLE 8
## FREQUENTLY ASKED QUESTIONS

**What Are the Debtors Attempting to Do in Chapter 11?** Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor attempts to restructure the claims held against it. Formulation and confirmation of a plan of reorganization is the primary goal of Chapter 11. When reorganization is not feasible, however, a debtor may propose a liquidating plan under Chapter 11. The plan is the legal document which sets forth the manner and the means by which holders of claims against a debtor will be treated.

**Why Am I Receiving This Plan?** In order to confirm a plan of reorganization, the Bankruptcy Code requires that a debtor solicit acceptances of a proposed plan, which it is doing with this Plan. If the creditors are satisfied with the information provided in the Plan and the terms of the Plan as proposed, and have voted for the Plan and returned the requisite number of ballots to counsel for the Debtors, the Bankruptcy Court may confirm the Plan as proposed by the Debtors.

**How Do I Determine Which Class I Am In?** To determine the class of your claim or interest, you must first determine whether your claim is secured or unsecured. Your claim is secured if you have a validly perfected security interest in collateral owned by the Debtor. If you do not have any collateral, your claim is unsecured. The Table of Contents will direct you to the treatment provided to the class in which you are grouped. The pertinent section of the Plan dealing with that class will explain, among other things, who is in that class, what is the size of the class, what you will receive if the Plan is confirmed, and when you will receive what the Plan has provided for you if the Plan is confirmed. Section 2.2 lists all classes of claimants and their types of claims. Holders of Equity Interests are described in Classes 6 and 7.

**Why Is Confirmation of a Plan of Liquidation Important?** Confirmation of the Plan is necessary because if the Plan is confirmed, the Debtors and all of their creditors are bound by the terms of the Plan. If the Plan is not confirmed, the Debtors may not pay creditors as proposed in the Plan while the Debtors remain in bankruptcy.

**What Is Necessary to Confirm a Plan?** Confirmation of the Plan requires, among other things, the vote in favor of the Plan of two-thirds in total dollar amount and a majority in number of claims actually voting in each voting class. If the vote is insufficient, the Bankruptcy Court can still confirm the Plan, but only if certain additional elements are shown including that the plan

does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

**Am I Entitled to Vote on the Plan?** Any creditor or equity owner of the Debtors whose claim is IMPARIED under the Plan is entitled to vote, if either (i) the creditor's claim has been scheduled by the Debtors and such claim is not scheduled as disputed, contingent, or unliquidated, or (ii) the creditor has filed a proof of claim on or before the last date set by the Bankruptcy Court for such filings. Any claim to which an objection has been filed (and such objection is still pending) is not entitled to vote, unless the Bankruptcy Court temporarily allows the creditor to vote upon the creditor's motion. Such motion must be heard and determined by the Bankruptcy Court prior to the date established by the Bankruptcy Court to confirm the Plan.

**How Do I Determine Whether I Am in an Impaired Class?** Section 2.2 of the Plan identifies the classes of creditors whose claims are impaired. If your claim is impaired, your vote will be considered by the Bankruptcy Court.

**When Is the Deadline by Which I Need to Return My Ballot?** The Plan is being distributed to all claim holders for their review, consideration and approval. The deadline by which ballots must be returned is [     ]. Ballots should be mailed to the following address: [     ].

**How Do I Determine When and How Much I Will Be Paid?** In Section 2.2, the Debtors have provided both written and financial summaries of what it anticipates each class of creditors will receive under the Plan.

**ARTICLE 9**
**DEFINITIONS**

The definitions and rules of construction set forth in sections 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan. The definitions that follow that are found in the Bankruptcy Code are for convenience of reference only, and are superseded by the definitions found in the Bankruptcy Code.

**9.1** **1601 Offering:** that certain investment offering launched by Nightingale through CrowdStreet Marketplace on November 1, 2022.

**9.2** **1601 Motion:** that certain Motion for Entry of an Order (I) Authorizing the Used of Property of Estate Outside the Ordinary Course of Business, (II) Authorizing the Release of Any Causes of Action Against the Buyer and the Lincoln Place Property, and (III) Granting Related Relief, filed by the Debtors in these Chapter 11 Cases on October 2, 2023.

**9.3** **1601 Sale Proceeds:** the Debtors' right to receive payments from the sale of Lincoln Place under the 1601 Motion, in the estimated amount of $8.8 million.

**9.4** **Administrative Claimant**: Any person entitled to payment of an Administrative Expense.

**9.5** **Administrative Expense**: Any cost or expense of administration of these Chapter 11 Cases entitled to priority under Section 507(a)(2) of the Bankruptcy Code and allowed under

Section 503(b) of the Bankruptcy Code, including without limitation, any actual and necessary expenses of preserving the Debtors' estates, any actual and necessary expenses incurred following the filing of the bankruptcy petition by the Debtors, allowances of compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under the Bankruptcy Code, the allowed claim of the Trustee for fees and/or reimbursements, and any fees or charges assessed against any of the Debtors' estates under Chapter 123, Title 28, United States Code.

**9.6     Administrative Tax Claim**: Any tax incurred pursuant to Section 503(b)(1)(B) of the Bankruptcy Code.

**9.7     AFC Offering:** that certain investment offering launched by Nightingale through CrowdStreet Marketplace on May 26, 2022.

**9.8     Allowed Claim**: Any claim against the Debtors pursuant to Section 502 of the Bankruptcy Code to the extent that: (a) a Proof of Claim was either timely filed or was filed late with leave of the Bankruptcy Court or without objection by the Debtors, and (b) as to which either (i) a party in interest, including the Debtors, does not timely file an objection, or (ii) is allowed by a Final Order.

**9.9     Allowed CS Pre-Petition Claims**: means all general unsecured claims held by CrowdStreet against the Debtors, which are allowed in the amount of $400,000 against each Debtor, and which, for the avoidance of doubt, shall be calculated as $400,000 total in calculating Subordinated CS Pre-Petition Claims.

**9.10    Allowed DIP Claims**: means any Claim of the DIP Lender against any of the Debtors arising under the DIP Loan Documents.

**9.11    Allowed Equity Interest**: Any Equity Interest in the Debtors that: (i)(a) is scheduled by the Debtors; or (b) a Proof of Interest was either timely filed or was filed late with the leave of the Bankruptcy Court or without objection by the Debtors, and (ii) as to which either (a) a party in interest, including the Debtors, does not timely file an objection, or (b) is allowed by a Final Order.

**9.12    Allowed Priority Tax Claim**: A Priority Tax Claim to the extent that it is or has become an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtors or Debtor-in-Possession shall be entitled on the Confirmation Date.

**9.13    Allowed Priority Non-Tax Claim**: means a Priority Non-Tax Claim to the extent such Priority Non-Tax Claim is or becomes an Allowed Claim.

**9.14    Allowed Secured Claim**: Allowed Secured Claims are claims secured by property of the Debtors' bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under section 506 of the Bankruptcy Code.

**9.15    Allowed Unsecured Claim**: An Unsecured Claim to the extent it is, or has become, an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtor or Debtor-in-Possession shall be entitled on the Confirmation Date.

**9.16    Asset**: Means Estate Assets (as defined herein).

**9.17    Atlanta Financial Center:** means that large commercial real estate complex in Atlanta, Georgia located at 3333 Peachtree Road NE, 3343 Peachtree Road NE, and 3353 Peachtree Road NE.

**9.18    Bankruptcy Code or Code**: The Bankruptcy Reform Act of 1978, as amended and codified as Title 11, United States Code.

**9.19    Bankruptcy Court**: The United States Bankruptcy Court for the District of Delaware.

**9.20    Bankruptcy Rules**: The Federal Rules of Bankruptcy Procedure.

**9.21    Cash**: Cash, cash equivalents and other readily marketable securities or instruments issued by a person other than the Debtors, including, without limitation, readily marketable direct obligations of the United States of America, certificates of deposit issued by banks and commercial paper of any entity, including interest accrued or earned thereon.

**9.22    Causes of Action**: means any and all actions, causes of action, derivative litigation claims, claims against directors and officers, liabilities, obligations, rights, suits, damages, judgments, claim, and demands whatsoever, whether known or unknown, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Debtors' respective Petition Dates or during the course of the Chapter 11 Cases.

**9.23    Chapter 11 Cases**: These cases under chapter 11 of the Bankruptcy Code in which ONH AFC CS INVESTORS LLC and ONH 1601 CS INVESTORS LLC are the Debtors and Debtors-in-Possession.

**9.24    Claim**: Any "right to payment from the Debtor whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or any right to an equitable remedy for future performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, disputed, undisputed, secured or unsecured." 11 U.S.C. § 101(5).

**9.25    Class**: A category of holders of claims or interests which are substantially similar to the other claims or interests in such class.

**9.26    Collateral**: means any property or interest in property of the estates of the Debtors subject to a lien, charge, or other encumbrance to secure the payment or performance of a Claim, which lien, charge, or other encumbrance is not subject to avoidance under the Bankruptcy Code.

**9.27    Confirmation**: The entry by the Bankruptcy Court of an order confirming this Plan.

**9.28    Confirmation Date**: The Date upon which the Bankruptcy Court shall enter the Confirmation Order; provided however, that if on motion the Confirmation Order or

consummation of the Plan is stayed pending appeal, then the Confirmation Date shall be the entry of the Final Order vacating such stay or the date on which such stay expires and is no longer in effect.

**9.29**    **Confirmation Hearing**: The hearing to be held on December 14, 2023 to consider confirmation of the Plan.

**9.30**    **Confirmation Order**: An order of the Bankruptcy Court or any amendment thereto confirming the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code.

**9.31**    **Creditor**: Any person who has a Claim against either of the Debtors that arose on or before the Petition Date.

**9.32**    **Creditor Beneficial Interests**: means the uncertificated beneficial interests in the Liquidating Trust evidencing the right of each holder of Allowed Claims against either of the Debtors to receive distributions from the Liquidating Trust in accordance with the Plan and Liquidating Trust Agreement prior to any distributions on account of Equity Beneficial Interests.

**9.33**    **CrowdStreet** means CrowdStreet, Inc, a Delaware Corporation.

**9.34**    **CrowdStreet Settlement** means that certain optional settlement agreement between and among the Debtors and CrowdStreet as described in greater detail in Section 1.9.D.

**9.35**    **CS Fund Investors** means C-Reit and Sunbelt Funds to the extent they hold Equity Interests in either of the Debtors.

**9.36**    **CS Opt-In** means the option of each holder of a Class 4 through 7 Claim or Equity Interest to opt-in to the CS Release in exchange for CrowdStreet's agreement described in this Plan to subordinate certain of its claims and make available the Liquidating Trust Loan.

**9.37**    **CS Release** means the release from each holder of a Class 4 through 7 Claim or Equity Interest that elects to opt-in to the CS Opt-In to CrowdStreet in exchange for CrowdStreet's agreement described in this Plan to subordinate certain of its claims and make available the Liquidating Trust Loan.

**9.38**    **Debtors and Debtors in Possession**:  Refers to both of the Debtors in the above-captioned Chapter 11 Cases.

**9.39**    **DIP Lender**: means CrowdStreet, Inc., the lender pursuant to the DIP Loans.

**9.40**    **DIP Loans**: means, collectively, any loans provided by the DIP Lender in connection with these Chapter 11 Cases.

**9.41**    **DIP Loan Documents**: means that certain Debtor-In-Possession Loan and Security Agreement entered into between the Debtors and the DIP Lenders, the DIP Orders, and all amendments, documents, instruments, guarantees, and agreements executed and delivered in connection therewith.

**9.42** **DIP Orders**: means, collectively, any interim or final orders entered by the Court in connection with the DIP Loans.

**9.43** **Disputed Claim**: Any Claim or Equity Interest against the Debtors that the Debtors have in any way objected to, challenged or otherwise disputed. There shall be no distribution on Disputed Claims unless and until it becomes an Allowed Claim or Allowed Interest. To the extent a Disputed Claim becomes an Allowed Claim or Allowed Interest, such Allowed Claim or Interest shall be entitled to the distributions such holder would have received had its Claim or Interest been Allowed on the Effective Date.

**9.44** **Distributions**: The property required by the Plan to be distributed to the holders of Allowed Claims and Equity Interests.

**9.45** **Effective Date**: the effective date of a chapter 11 plan is 30 days after entry of the order confirming the plan unless the plan or confirmation order provides otherwise.

**9.46** **Estates**: means the bankruptcy estates of the Debtors in the Chapter 11 Cases, as created under section 541 of the Bankruptcy Code.

**9.47** **Estate Assets**: means all of the assets, property, and cash of each of the Debtors, as defined in section 541 of the Bankruptcy Code (excluding assets previously distributed, expended, or otherwise disposed of by the Debtors prior to the Effective Date and not otherwise subject to recovery), wherever located or of whatever type or nature, existing as of the Effective Date, including, without limitation, all Causes of Action.

**9.48** **Equity Beneficial Interests**: means the uncertificated beneficial interests in the Liquidating Trust evidencing the right of each holder of Allowed Equity Interests against a Debtor to receive distributions from the Liquidating Trust in accordance with the Plan and Liquidating Trust Agreement.

**9.49** **Equity Interest**: An ownership interest in a Debtor.

**9.50** **Executory Contracts**: All unexpired leases and executory contracts as described in Section 365 of the Bankruptcy Code.

**9.51** **Final Order**: An order or judgment of the Bankruptcy Court that has not been reversed, stayed, modified or amended and as to which (a) any appeal that has been taken has been finally determined or dismissed, or (b) the time for appeal has expired and no notice of appeal has been filed.

**9.52** **General Unsecured Claim**: means any Claim against a Debtor that is (i) not a Secured Claim, Administrative Expense Claim, Priority Tax Claim, or Priority Non-Tax Claim, or (ii) is otherwise determined by the Bankruptcy Court to be an Unsecured Claim.

**9.53** **Governmental Unit**: has the meaning set forth in section 101(27) of the Bankruptcy Code.

**9.54**   **Governmental Unit Bar Date**: means January 10, 2024, the deadline for Governmental Units to file a proof of Claim against a Debtor for a Claim that arose before the Petition Date.

**9.55**   **Holder**: means the legal or beneficial owner of a Claim or Equity Interest, and when used in conjunction with a class or type of Claim or Equity Interest, means a Holder of a Claim or Equity Interest in such Class or of such type.

**9.56**   **Independent Manager:** means Ms. Anna Phillips, solely in her capacity as such, and not in her individual capacity.

**9.57**   **Investor Individual SN Claims**: means all Claims and Causes of Action held by a holder of an Equity Interest in a Debtor, which Claim and Cause of Action is against the Schwartz Nightingale Parties relating in any way to the Debtors, and which shall be deemed contributed to the Liquidating Trust by the holder's election to "opt in" to on such holder's Ballot.

**9.58**   **Insider** has the meaning set forth in section 101(31) of the Bankruptcy Code.

**9.59**   **Impaired**: means an Allowed Claim that is Impaired within the meaning of section 1124 of the Bankruptcy Code.

**9.60**   **Lincoln Place:** means that certain mixed-use building in Miami Beach, Florida located at 1601 Washington Avenue.

**9.61**   **Liquidating Trust**: means the liquidating trust that will come into existence on the Effective Date for the benefit of the holders of Creditors and Equity Interest Holders in the Debtors, and which will be formed pursuant to and governed by the Liquidating Trust Agreement.

**9.62**   **Liquidating Trustee**: means Ms. Anna Phillips, not individually but solely in her capacity as Trustee of the Liquidating Trust.

**9.63**   **Liquidating Trust Committee:** means the Committee, composed of no more than three (3) current members of the Debtors, to be identified prior to the Effective Date. The Liquidating Trust Committee will oversee the activities of the Liquidating Trustee and shall have the duties and responsibilities more fully set forth in the Liquidating Trust Agreement.

**9.64**   **Liquidating Trust Agreement**: means that certain agreement governing the Liquidating Trust dated as of the Effective Date, substantially in the form included in the Plan Supplement.

**9.65**   **Liquidating Trust Assets**: means all Estate Assets of each Debtor including but not limited to the Causes of Action, and the Debtors' respective interests in the 1601 Sale Proceeds and Schwartz Nightingale Settlement.

**9.66**   **Liquidating Trust Loan** means the loan from CrowdStreet to the Liquidating Trust that may be made available in eight equal quarterly installments beginning January 1, 2025 irrespective of the timing of any default by the Schwartz Nightingale Parties under the Schwartz Nightingale Settlement, except as set forth in the next sentence. If the Schwartz Nightingale Parties

do not make the initial payment due under the Schwartz Nightingale Settlement and such default has not been cured within 30 days, then the Liquidating Trust will be permitted to immediately draft $300,000 as a Liquidating Trust Loan or any lesser amount (to the extent sufficient Equity Interests have opted in to the CS Opt-In to require such amount to be available) and the remainder of any Liquidating Trust Loan commitment shall be spread over eight equal quarterly installments beginning in the first quarter thereafter.

**9.67    Offerings:** means collectively the AFC Offering and the 1601 Offering.

**9.68    Opt-In Process:** means collectively the process by which the holders of Claims against the Debtors elect to participate in the CS Opt-In and the SN Opt-In.

**9.69    Petition Date**: July 14, 2023, the date the Debtors' chapter 11 petitions for relief were filed.

**9.70    Plan**: This Plan, either in its present form or as it may be altered, amended, or modified from time to time.

**9.71    Plan Supplement**: means the appendix of any schedules or exhibits that may be filed at least fourteen (14) days prior to the deadline for submission of Ballots to vote to accept or reject the Plan. The Plan Supplement will be filed with the Bankruptcy Court and served on the required notice parties and shall be made available on the Debtors' claims agent's website dm.epiq11.com/case/onhinvestors/info.

**9.72    Pro Rata Share**: means the proportion that the amount of an Allowed Claim or Equity Interest in a particular Class bears to the aggregate amount of all Allowed Claims or Equity Interests (including Disputed Claims, but excluding Disallowed Claims) in that particular Class.

**9.73    Priority Non-Tax Claim**: means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7), or (9) of the Bankruptcy Code.

**9.74    Priority Tax Claim**: Any Claim entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.

**9.75    Schedules and Statements**: Schedules and Statement of Financial Affairs, as amended, filed by the Debtors with the Bankruptcy Court listing their respective liabilities and assets.

**9.76    Schwartz Nightingale Settlement** means the Settlement and Conditional Release Agreement dated as of October 2, 2023, by and among (i) the Debtors and (ii) the Schwartz Nightingale Parties.

**9.77    Schwartz Nightingale Parties** means the non-Debtor parties to the Schwartz Nightingale Settlement: Elchonon ("Elie") Schwartz (also referred to herein as "Mr. Schwartz"), One Night Holdings LLC, Nightingale Properties, LLC, One Night Properties LLC, ES 28 Holdings LLC (to the extent covered by the Schwartz Nightingale Settlement), ES28 Investments LLC, Nightingale Property Group LLC, The Nightingale Group, LLC, Nightingale Realty, LLC,

Nite Sky Management LLC, AAF 1601 Washington Ave TIC, ONH 2226 Third Ave LLC, Five Park 3003 LLC, 1 Westend PH-A LLC, 320 Mountain Road LLC, 1835 Market Investors LLC, 1635 Market Investors LLC, 1500 Spring Garden Investors LLC, NG 1601 Washington Ave LLC, Midnight Capital Partners LLC, ONH Promote LLC, ES 1 Westend Residence Trust, The Elchonon Schwartz Family Trust, ES28 Investments Trust, ES ONH Trust, Schwartz Family Charitable Trust, and ES Family Life Insurance Trust dated June 22, 2022.

**9.78    Section 510(b) Subordinated Claims** means a claim against a Debtor that is subordinated and treated as on par with Equity Interests against such Debtor by agreement between the Debtor and holder or by a Final Order of the Bankruptcy Court.

**9.79    Secured Claim**: means a Claim (i) secured by Collateral, to the extent of the value of such Collateral (a) as set forth in the Plan, (b) as agreed to by the holder of such Claim and a Debtor, or (c) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any rights of setoff of the holder thereof under section 553 of the Bankruptcy Code.

**9.80    Secured Creditor**: Any creditor that holds a Claim that is secured by property of a Debtor.

**9.81    SN Opt-In** means the option of each holder of a Class 4 through 7 Claim or Equity Interest to opt-in to the SN Release in exchange for 5% annual simple interest on the unpaid amount of such holder's Claim or Equity Interest, beginning on the Effective Date and ending on the date of payment, to be paid after recovery of its Claim or Equity Interest.

**9.82    Subordinated CS Pre-Petition Claims** means CS Pre-Petition Claims (as defined herein) to the extent they are treated as subordinated to all other Classes under the terms of the Plan.

**9.83    Subordinated DIP Claims** means DIP Claims (as defined herein) to the extent they are treated as subordinated to all other Classes under the terms of the Plan.

**9.84    Trustee**: David Klauder, the trustee appointed pursuant to 11 U.S.C. § 1183(a) and whose duties are prescribed under 11 U.S.C. 1183(b), the Plan, or the order confirming the Plan.

**9.85    Unsecured Creditor**: Any Creditor that holds a Claim in the Chapter 11 Cases which is not a Secured Claim.

*[Remainder of page is intentionally blank]*

Dated: October 25, 2023
    Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
    mcguire@lrclaw.com
    pierce@lrclaw.com

- and -

**BAKER & HOSTETLER LLP**

Jorian L. Rose (pro hac vice pending)
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
Email: jrose@bakerlaw.com

Andrew V. Layden (pro hac vice pending)
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, FL 32801-3432
Telephone: (407) 649-4000
Facsimile: (407) 841-0168
Email: alayden@bakerlaw.com

## **EXHIBIT 1**

### **SCHEDULE OF CAUSES OF ACTION TO BE TRANSFERRED AND RETAINED BY THE LIQUIDATING TRUST**

## SCHEDULE OF CAUSES OF ACTION TO BE TRANSFERRED AND RETAINED BY THE LIQUIDATING TRUST

> **PLEASE TAKE NOTICE: No Person, Creditor, or Equity Interest Holder may rely on the absence of a specific or categorical reference in the Plan or the Plan Supplement to any Cause of Action against it as any indication that the Debtors or Liquidating Trust will not pursue any and all available Causes of Action against it.**
>
> **The Debtors and Liquidating Trust expressly reserve all rights to prosecute any and all Causes of Action against any Person, Creditor, or Equity Interest Holder. Unless a Cause of Action is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Debtors and Liquidating Trust expressly reserves all Causes of Action for later adjudication, and thus, no preclusion doctrine, including res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a result of confirmation or consummation of the Plan.**

Section 2.5 of the Plan contemplates the transfer of the Property and Causes of Action to the Liquidating Trust on the Effective Date.

Notwithstanding and without limiting the generality of Section 2.5 of the Plan, this schedule identifies specific Causes of Action, currently known to the Debtors, which are expressly preserved by the Debtors and Liquidating Trust. It is anticipated that following the Effective Date, the Liquidating Trust will pursue some or all of these Causes of Action in an effort to increase the amount of Cash in the Liquidating Trust, which may, in turn, result in a higher payout to the Holders of Allowed Claims and Allowed Equity Interests against or in the Debtors.

In addition to the Causes of Action identified below, there may be additional Causes of Action based on state or federal law which currently exist or may arise that are not set forth herein, because the facts that form the basis of such Causes of Action are not fully or currently known by the Debtors (the "Unknown Causes of Action"). The intent of the Plan is to transfer all of the Debtors' Causes of Action, including any Unknown Causes of Action, as well as Investor Assigned Claims, to the Liquidating Trust. For the avoidance of doubt, the failure to list any Cause of Action, including any Unknown Cause of Action, in the Plan is not in any way intended to waive such claims or limit the rights of the Liquidating Trust to pursue such claims.

## RETAINED CAUSES OF ACTION

1. The Debtors are party to a number of insurance contracts and policies. Such policies are identified on each of the Debtors' respective Schedule A/B and Schedule G in their Schedules and Statements. The Debtors expressly reserve all Causes of Action based in whole or in part upon any and all insurance contracts, insurance policies, occurrence policies, and occurrence contracts to which any of the Debtors is a party or pursuant to which any of the Debtors has rights whatsoever.

2.      The Debtors may have retained multiple outside law firms, consulting firms, and accounting firms to represent Debtors in connection with their businesses. The Debtors expressly reserve all Causes of Action against such professional firms, for, among other things, negligence and malpractice relating to the services provided to the Debtors.

3.      All Causes of Action against the Debtors' former shareholders for fraudulent transfer and the recovery of any dividends or other consideration paid to shareholders.

4.      All Causes of Action for avoidance and recovery under sections 541, 542, 543, 544, 545, 547, 548, 549, 550, and 553(b) of the Bankruptcy Code and all applicable state law.

5.      All Causes of Action against any Insider of the Debtors.

6.      All Claims and Causes of Action, including but not limited to, breach of fiduciary duty, fraud, aiding and abetting fraud, civil theft, unjust enrichment, civil conspiracy, negligence, negligent misrepresentations, self-dealing, fraudulent transfer, and breach of contract, against the following people and any of their affiliates: (i) the Insiders of the Debtors, (ii) Nightingale Properties LLC, (iii) One Night Holdings, LLC, and (iv) Mr. Elchonon "Elie" Schwartz.

## **RESERVATION OF RIGHTS**

The Debtors reserve all rights to amend, revise, or supplement this schedule at any time before the Effective Date of the Plan.

## EXHIBIT 2

## SCHWARTZ NIGHTINGALE SETTLEMENT

## SETTLEMENT AND CONDITIONAL RELEASE AGREEMENT

This Settlement and Conditional Release Agreement (this "**Agreement**") is made and entered into as of October 2, 2023 (the "**Execution Date**") by and among (i) ONH 1601 CS Investors LLC and ONH AFC CS Investors LLC (collectively, the "**Debtors**"),[1] as debtors and debtors in possession in the Chapter 11 Cases (defined below), on behalf of themselves and their bankruptcy estates, and (ii) Elchonon ("Elie") Schwartz (also referred to herein as "Mr. Schwartz"), One Night Holdings LLC, Nightingale Properties, LLC, One Night Properties LLC, ES 28 Holdings LLC,[2] ES28 Investments LLC, Nightingale Property Group LLC, The Nightingale Group, LLC, Nightingale Realty, LLC, Nite Sky Management LLC, AAF 1601 Washington Ave TIC, ONH 2226 Third Ave LLC, Five Park 3003 LLC, 1 Westend PH-A LLC, 320 Mountain Road LLC, 1835 Market Investors LLC, 1635 Market Investors LLC, 1500 Spring Garden Investors LLC, NG 1601 Washington Ave LLC, Midnight Capital Partners LLC, ONH Promote LLC, ES 1 Westend Residence Trust, The Elchonon Schwartz Family Trust, ES28 Investments Trust, ES ONH Trust, Schwartz Family Charitable Trust, and ES Family Life Insurance Trust dated 06.22.2022 (the "**Schwartz Nightingale Parties**").  The Debtors and the Schwartz Nightingale Parties are referred to collectively hereinafter as the "**Parties**" and each individually as a "**Party**". To the extent **Garden Growth LLC** executes a joinder and assigns its claims, such party will also be treated as a Party for all purposes; provided that this Agreement shall be binding whether or not that joinder is signed.

## Recitals

**WHEREAS**, on July 14, 2023 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under subchapter V of chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (as amended, the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**Court**"), thereby commencing the chapter 11 cases that are being jointly administered for procedural purposes only *In re ONH AFC CS Investors LLC and ONH 1601 CS Investors LLC*, Case No. 23-10931 (CTG) (collectively, the "**Chapter 11 Cases**");

**WHEREAS**, on or about April 25, 2022, ONH AFC CS Investors LLC ("**ONH AFC**") was formed by the Schwartz Nightingale Parties to permit investment in certain real estate located in Atlanta, Georgia;

**WHEREAS**, on or about July 15, 2022, ONH 1601 CS Investors LLC ("**ONH 1601**") was formed by the Schwartz Nightingale Parties to permit investment in certain real estate located in Miami Beach, Florida;

**WHEREAS**, Ms. Anna Phillips was appointed as the independent manager (the "**Independent Manager**") for each of the Debtors on or about June 7, 2023;

---

[1] References in this Agreement to the Debtors shall mean either the Debtors or the Plan Trust (defined below), as applicable.

[2] ES 28 Holdings LLC be joined to the extent it is confirmed in existence and that Elchonon Schwartz has sign authority for this entity or any entity controlling this entity.

**WHEREAS**, on the Petition Date, the Debtors filed the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Post-Petition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Scheduling a Hearing, and (IV) Granting Related Relief* [D.I. 6] (the "**DIP Motion**") requesting approval of post-petition financing (the "**DIP Loan**"), and the Court granted the DIP Motion on a final basis on July 31, 2023, approving the DIP Loan [D.I. 59];

**WHEREAS**, since the appointment of the Independent Manager, the Debtors have investigated the pre-petition transactions involving the Schwartz Nightingale Parties, and the Debtors believe they have potential claims against the Schwartz Nightingale Parties arising from these transactions, whether under section 544 of the Bankruptcy Code or otherwise (collectively, the "**Potential Claims**");

**WHEREAS**, in connection with this Agreement, the Debtors will shortly file the ***Motion for Entry of An Order (I) Authorizing the Use of Property of Estate Outside of the Ordinary Course of Business, (II) Authorizing the Release of Any Causes of Action Against the Buyer and the Lincoln Place Property, and (III) Granting Related Relief*** (the "**Lincoln Place Motion**") and the Court's ***Order Granting the Lincoln Place Motion***, the Schwartz Nightingale Parties will (i) pay ONH 1601 an amount equal to **$8.83 million** (the "**1601 Payment**"), and (ii) place approximately $3 million pending final accounting and closing costs into escrow pending negotiations regarding resolution of the Potential Claims;

**WHEREAS**, in connection with the Chapter 11 Cases, the Debtors will file a *Chapter 11 Plan of ONH AFC CS Investors LLC and ONH 1601 CS Investors LLC* (the "**Plan**") and will seek confirmation of the Plan through a confirmation hearing (the "**Confirmation Hearing**") and resulting confirmation order (the "**Confirmation Order**");

**WHEREAS**, in connection with the Plan, a liquidating trust (the "**Plan Trust**") will be created to liquidate the Debtors' assets including, without limitation, any claims or causes of action;

**WHEREAS**, the Parties and their respective advisors have negotiated extensively, at arm's length and in good faith, in an effort to settle and compromise the various disputed issues and Potential Claims addressed by this Agreement, and this Agreement is the product of those negotiations; and

**WHEREAS**, the Parties enter into this Agreement to: (i) avoid the delay, uncertainty, inconvenience and expense of litigation relating to the Potential Claims or any other causes of action that could be asserted against the Schwartz Nightingale Parties by or on behalf of the Debtors' estates; (ii) facilitate the prompt payment by the Schwartz Nightingale Parties to the Debtors; (iii) resolve amounts put into escrow with such funds to be turned over to the Debtors' estates on the terms and conditions set forth herein; and (iv) resolve and/or otherwise address certain other matters among the Debtors and the Schwartz Nightingale Parties.

# Agreement

**NOW, THEREFORE**, in consideration of the mutual promises, covenants, considerations, waivers, and releases set forth herein, the receipt and sufficiency of which are hereby acknowledged by each Party, each Party hereby agrees as follows:

1.  <u>Recitals</u>.  The recitals set forth above are fully incorporated herein by reference and made an express part of this Agreement. The Parties stipulate and agree that each of the recitals and terms and conditions of this Agreement are an integral part of this Agreement.

2.  <u>Court Approval and Contingent upon Opt-In</u>.  This Agreement is subject in all respects to the Court's entry of an order (the "**Order**") approving this Agreement and authorizing the Debtors to perform hereunder, whether by separate motion or in connection with the Court's Confirmation Order. This Agreement is also contingent upon sufficient investors opting in so that the Plan is confirmed.  Except as set forth in this Agreement, this Agreement will become effective when both (i) the Court has entered such Order and (ii) the Plan is confirmed (which date shall be, the "<u>Effective Date</u>").

3.  <u>Settlement Payments</u>. In consideration of the various agreements contained in this Agreement including, without limitation, the conditional releases provided for in Section 7 hereof, the Schwartz Nightingale Parties shall pay to the Debtors an amount equal to an aggregate amount to be calculated on the date of the Confirmation Hearing that shall include (v) the amounts invested in the Debtors through CrowdStreet, Inc., (w) the amounts invested in the Debtors by **Garden Growth LLC** to the extent such party executes a joinder, (x) $1 million (which is an estimate of the initial amount of Plan Trust expenses (hereafter the "**Plan Trust Budget**")), plus (y) repayment of the unforgiven amount of the DIP Loan, and (z) any loans to or expenses of the Debtors or the Plan Trust approved by the Court (collectively, the "**Aggregate Repayment Amount**"), as follows:

> a.  <u>Initial Payment.</u> On the earlier of the closing of the sale contemplated by the Lincoln Place Motion or December 31, 2023, the Schwartz Nightingale Parties shall pay the Debtors the total sum of at least $3,000,000 (which shall be held for the benefit of the Plan Trust pending approval of this Agreement (the "**Initial Payment**");
>
> b.  <u>Quarterly Payments</u>. Following the Initial Payment, the Schwartz Nightingale Parties shall pay to the Plan Trust the Aggregate Repayment Amount in equal Quarterly Payments (defined below). The Quarterly Payments shall be due and calculated as follows: commencing three calendar months after the Initial Payment, and for three years after the Initial Payment (12 total calendar quarters), the Schwartz Nightingale Parties shall pay the Debtors a Quarterly Payment.[3] The Quarterly Payment shall be calculated by subtracting the Initial Payment and, if paid, the 1601 Payment

---

[3] Thus, for example, if the Initial Payment date was November 1, 2023, the next two Quarterly Payments would be due on February 1, 2024, and May 1, 2024.

from the Aggregate Repayment Amount and dividing the sum by 12 (each a "**Quarterly Payment**").

    c.   <u>Opt-in Investors</u>. The Debtors' proposed Plan allows each investor in the Debtors, other than the Schwartz Nightingale Parties, to elect to assign to the Plan Trust their potential claims and causes of action against the Schwartz Nightingale Parties. To the extent an investor elects to assign all of his or her potential claim(s) and causes of action against the Schwartz Nightingale Parties to the Plan Trust, each such investor shall receive an increased claim equal to 5% annual interest. Such interest will be paid after repayment of the Aggregate Repayment Amount to such investors and included in the final Quarterly Payment. To the extent Garden Growth LLC executes a joinder and assigns all potential claims and causes of action against the Schwartz Nightingale Parties to the Plan Trust, it shall also be treated as an opt-in investor.

    d.   <u>Additional Quarterly Payment Calculation Terms</u>:

        i.   To the extent that the Schwartz Nightingale Parties make any payment that exceeds the required Quarterly Payment, such additional payment shall reduce the next required Quarterly Payment by such excess.

        ii.   If a Quarterly Payment is not made on the date it is due, the Schwartz Nightingale Parties shall have ten (10) business days after such date to make such payment, but the Aggregate Repayment Amount shall increase by an amount equal to 1% of the balance of the then unpaid Aggregate Repayment Amount.

        iii.   To the extent (i) the Schwartz Nightingale Parties default under this Agreement or (ii) the Plan Trust expenses exceed the Plan Trust Budget by an amount not realized at that time from proceeds of collection efforts from third parties, the excess expenses shall be added to the Aggregate Repayment Amount and shall be included in the final Quarterly Payment.

4.    <u>The Interests in, Sale of, and Marketing of the Schwartz Nightingale Parties' Assets</u>.

    a.   The Schwartz Nightingale Parties shall commence marketing and sale of their assets and will use their best efforts to pursue, negotiate, market and/or sell all material assets. The Schwartz Nightingale Parties shall arrange for the marketing and liquidation of their assets with full consultation and information rights in favor of the Debtors. Upon request, the Schwartz Nightingale Parties shall provide the Debtors with access rights to any and all brokers, auctioneers, or any similar agents for the sale of any assets.

b. From and after the Effective Date, the Schwartz Nightingale Parties must make good faith efforts to give direction that all net[4] proceeds of the sales of the Schwartz Nightingale Parties' assets are to be paid directly to the Debtors. The Debtors, in turn, will pay the Schwartz Nightingale Parties 10% of the net proceeds within three (3) business days of receiving such proceeds. The net proceeds of such sales paid to the Debtors shall be paid into escrow to be applied to the Quarterly Payments as directed by the Schwartz Nightingale Parties or other payments to reduce the Aggregate Repayment Amount. To the extent that net proceeds of the sales are paid to the Schwartz Nightingale Parties directly, the Schwartz Nightingale Parties will pay 90% of the net proceeds of the sale to the Debtors and retain 10% of the net proceeds. The Schwartz Nightingale parties shall provide an accounting to the Debtors.

c. Except as where not permitted by law or, with respect to the Schwartz Nightingale Parties exclusive of Mr. Schwartz, ES28 Investments LLC, 1 Westend PH-A LLC, ES ONH Trust, ES 1 Westend Residence Trust, ES Family Life Insurance Trust, The Elchonon Schwartz Family Trust, ES28 Investments Trust, and any other trust he has created, where any pledge would create a default under separate third party agreements, the Schwartz Nightingale Parties shall agree to provide the Debtors with security interests, liens, pledges, assignments or other collateral interests (including by possession where specified) in all of their assets, including, without limitation, any assets owned directly or indirectly by any entity, person, or trust named in this Agreement. Such collateral interests will be released upon sale. Where the Schwartz Nightingale Parties cannot deliver a pledge or lien due to the foregoing exception, the Schwartz Nightingale Parties shall seek consent of such lenders if there is a restriction on such pledge or lien (except where not reasonably likely, for example, where there is on-going litigation with such lender) and work in good faith to otherwise commit or assign the proceeds of such assets to the Debtors or provide such other comparable protections as are permissible.

d. The Schwartz Nightingale Parties shall provide the Debtors with account control agreements related to, and online access to, their bank accounts and pledge any securities, including without limitation, the UBS investment accounts and any other brokerage accounts. The Schwartz Nightingale Parties shall not open or use any additional bank account or investment account without an account control agreement in favor of the Debtors covering such account. For the avoidance of doubt, if a bank account is opened by a new entity that is not a Schwartz Nightingale Party using money from third parties unrelated to this Agreement, such action is permitted by this Agreement and no pledge over the account is required.

---

[4] Net means after deducting the costs of such sale.

e.  The Schwartz Nightingale Parties shall provide all required security and lien documentation requested by the Debtors fourteen (14) business days prior to the later of (1) the date scheduled for approval of this Agreement by the Court or (2) the Confirmation Hearing.

f.  <u>Marketing and Sale of Assets.</u> The Schwartz Nightingale Parties shall commence marketing and sale of their assets as follows and shall provide a signed affidavit to the Debtors detailing the assets of material value.

   i.  The Schwartz Nightingale Parties shall continue to pursue the marketing and sale of the real property located at 320 Mountain Rd., Englewood, NJ, 07631.

   ii.  The Schwartz Nightingale Parties shall commence marketing and sale of all jewelry, watches, or art (as requested by the Debtors). Upon request after the Effective Date, the Schwartz Nightingale Parties shall provide physical control over all watches and jewelry to a third party custodian for purposes of creating a possessory lien in favor of and as requested by the Debtors. The Schwartz Nightingale Parties shall continue to market and sell such items and provide the Debtors with a quarterly update on progress and designate the Debtors as the beneficial owner on account of the granted lien for such property provided to any third party.

   iii.  The Schwartz Nightingale Parties shall provide a lien on and seek payment for all acquisition fee receivables and any real estate deposits including, without limitation, in Five Park 3003 LLC.

   iv.  If possible, the Schwartz Nightingale Parties shall cause the Debtors to be named insureds on all applicable insurance policies, provide a lien or junior lien (as applicable) on and seek payment for any insurance claims or investments held in relation to insurance policies in which the Schwartz Nightingale Parties have an interest or that benefit the Schwartz Nightingale Parties in any way, including the proceeds and claims related to any insurance policies or recoveries in which the Schwartz Nightingale Parties have an interest or that benefit the Schwartz Nightingale Parties in any way;

   v.  The Schwartz Nightingale Parties shall provide a lien on and seek payment for any loan receivables due to them;

   vi.  The Schwartz Nightingale Parties shall provide a lien on and seek payment for any interests in Nightingale Group, LLC, Nightingale Realty, LLC, Nite Sky Management LLC, and One Night Holdings LLC, and any other affiliate, including but not limited to proceeds from sale of real estate holdings, as well as ES28 Investments LLC or any investments, including MVI Systems LLC, Nighttime

Holdings LLC, Dark Night Collectibles LLC, and any other investment in whatever form; and

vii. The Schwartz Nightingale Parties shall provide a lien on and seek payment for any investments held by the Schwartz Nightingale Parties in any IBEX accounts.

viii. <u>Provisions for 1 West End Marketing and Sale.</u>

1. The Schwartz Nightingale Parties agree to sell the apartment at 1 West End Avenue in New York, NY, 10023 ("**<u>1 West End</u>**"), as provided herein. The Schwartz Nightingale Parties will arrange for a broker (with the consent of the Debtors) and provide the Debtors unfettered access to that broker to market for sale or rental of 1 West End. The broker shall be unaffiliated with the Schwartz Nightingale Parties and shall be hired only after consultation with the Debtors.

2. Marketing of 1 West End will begin six (6) months ("**<u>Marketing Period</u>**") after the Court confirms the Plan and the Agreement is approved and signed. In the event of the sale of 1 West End, the Schwartz Nightingale Parties shall retain 10% of the proceeds payable to the Debtors from the sale to provide for alternate accommodations for the Schwartz family.

3. Prior to the Marketing Period, the Schwartz Nightingale Parties will work on a relocation plan for Mr. Schwartz including finding a new home and arranging for any financing needed, as well as arranging the logistics necessary for moving. At the commencement of the Marketing Period, all residents of 1 West End must vacate the property (unless otherwise directed by the Debtors).

4. Prior to the Marketing Period, Mr. Schwartz and his family are permitted to live in the apartment.

5. To the extent that the Schwartz Nightingale Parties can originate an alternative transaction that provides equivalent amount of proceeds to the Debtors and would not inhibit the Schwartz Nightingale Parties' ability to comply with the completion of payments under the Agreement, in the Debtors' reasonable judgment, then at their election, the Debtors can pursue this alternative transaction. Within thirty (30) days of the Execution Date, the parties shall meet and confer regarding the parameters of a transaction that would be deemed reasonably acceptable under this section.

5.    <u>Confessions of Judgment</u>. The Schwartz Nightingale Parties shall sign separate confessions of judgment as directed in favor of the Debtors and Plan Trust (the "**Confessions of Judgment**") in the form of <u>Exhibit A</u> attached hereto.  The Schwartz Nightingale Parties shall provide such executed Confessions of Judgment prior to the Confirmation Hearing.  Such Confessions of Judgment will be held in escrow until the approval of this Agreement by the Court and full execution by the Debtors.  The Confessions of Judgment shall then be held by the Debtors in the event of a failure to pay or other breach of the Agreement subject to the applicable cure period.

6.    <u>Other Debtor/ Plan Trust Collections</u>. To the extent the Debtors or Plan Trust collect any amounts on account of claims arising under Bankruptcy Code section 544, the net proceeds of such actions shall be applied to the last Quarterly Payment, but only to the extent that such recoveries do not result in springing claims by a party against the Debtors or Plan Trust, and only to the extent such proceeds are not utilized as Plan Trust expenses in collecting on such action or for any other Plan Trust general administrative expenses.

7.    <u>Conditional Releases</u>.

a.    <u>Releases by the Estate Parties</u>. If the Schwartz Nightingale Parties complete payments for the Aggregate Repayment Amount and any other amounts owing under this Agreement, the Debtors, for themselves and on behalf of their bankruptcy estates and any opt-in investors that assigned all of their potential claims to the Plan Trust pursuant to section 3(c) (collectively, the "**Estate Parties**") and any and all other entities who may purport to assert any claims or causes of action, directly or derivatively by, through, for, or because of the foregoing entities  shall be deemed to have fully, finally, unconditionally, irrevocably and forever released, waived and discharged the Schwartz Nightingale Parties from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, in law, admiralty or equity, which the Estate Parties now have or hereafter can, shall or may, have for, upon, or by reason of any matter, cause or thing whatsoever have as of the date of this release, including, without limitation, any and all claims that could have been brought in or with respect to the Potential Claims, except that the foregoing shall not: (i) release, waive, or discharge the right to enforce this Agreement and all documents ancillary thereto and (ii) release, waive, or discharge any direct third party claims owned by the investors not otherwise assigned to the Plan Trust.

b.    <u>Releases by the Schwartz Nightingale Parties</u>. If the Schwartz Nightingale Parties complete payments for the Aggregate Repayment Amount and any other amounts owing under this Agreement, the Schwartz Nightingale Parties and any and all other entities who may purport to assert any claims or causes of action, directly or derivatively by, through, for, or because of the foregoing entities  shall  be  deemed  to  have  fully,  finally,

- 8 -

unconditionally, irrevocably and forever released, waived and discharged the Estate Parties from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, in law, admiralty or equity, which the Schwartz Nightingale Parties now have or hereafter can, shall or may, have for, upon, or by reason of any matter, cause or thing whatsoever have as of the date of this release, including, without limitation, any and all claims that could have been brought in or with respect to the Potential Claims, except that the foregoing shall not release, waive or discharge the right to enforce this Agreement and all documents ancillary thereto.

c. If there is an event of default under this Agreement and that event of default is not cured by the later of the applicable cure timeframe set forth in this Agreement or five (5) business days, then the Debtors will not be bound by any of the waivers or releases provided in this Agreement. If there is an event of default under this Agreement, the Debtors may: (i) pursue any claims and causes of action including, without limitation, the Potential Claims; (ii) execute on the Confessions of Judgment; (iii) enforce any lien rights or security interests provided in this Agreement; and (iv) pursue all rights and remedies deemed by the Debtors as advisable and appropriate.

8.    Financial Disclosure.

a. Within thirty (30) days of execution of this Agreement, the Schwartz Nightingale Parties must execute a sworn affidavit under penalty of perjury that each Schwartz Nightingale Party has provided a complete and accurate representation of its or his financial condition to the best of its or his knowledge as stated therein in all material respects (the "**Initial Asset Disclosure Affidavit**"). The Initial Asset Disclosure Affidavit shall be substantially similar in form and substance, except in those instances where there has been a change in circumstances from the date of the execution hereof.

b. By the Confirmation Hearing, the Schwartz Nightingale Parties must execute a sworn affidavit under penalty of perjury that to their knowledge there have been no material changes to the Initial Asset Disclosure Affidavit (the "**Confirmation Asset Disclosure Affidavit**"). The Confirmation Asset Disclosure Affidavit shall either state that (a) there have been no changes to the Initial Asset Disclosure Affidavit or (b) describe any changes from the Initial Asset Disclosure Affidavit.

c. Within 30 days of the signing of this Agreement and until the Aggregate Repayment Amount is paid in full, the Schwartz Nightingale Parties must provide sale process updates to the Debtors in the form attached as Exhibit B each month for the first six (6) months following execution here of and

then quarterly thereafter. Such update shall be due ten (10) calendar days after each month end or when Quarterly Payment is made, as the case may be.

9.    Defaults and Remedies. The following shall constitute a default or event of default under this Agreement, along with any events of default set forth elsewhere in this Agreement:

    a.    The failure of any Schwartz Nightingale Party to meet any of the deadlines set forth in this Agreement;

    b.    The failure of any Schwartz Nightingale Party to comply with the terms and conditions set forth in this Agreement;

    c.    The determination by the Debtors or Plan Trust that any financial statements or disclosures of the Schwartz Nightingale Parties were fraudulent or purposefully materially misleading; or

    d.    The knowing failure of any Schwartz Nightingale Party to disclose any material asset or transfer of assets.

10.    Non-Dischargeable Obligations. This Agreement does not change the character or nature of the amounts owed to the Debtors for purposes of any future chapter 11 filing.

11.    Due Authorization; Binding Agreement; No Conflict. Each of the Parties hereby represents and covenants to the other Parties as follows:

    a.    such Party has the power, authority and the legal right to execute, deliver and perform under this Agreement;

    b.    the person executing this Agreement on such Party's behalf has the full right and authority to enter into this Agreement on behalf of such Party and has the full right and authority to execute this Agreement and to fully bind such Party to the terms and conditions hereof;

    c.    this Agreement has been duly executed and delivered by such Party and constitutes a legal, valid and binding obligation of such Party, enforceable in accordance with its terms; and

    d.    such Party's execution and delivery of this Agreement, and its or his performance of its or his obligations hereunder, have been duly authorized and do not and will not: (i) violate any provision of any law, rule, regulation, order, judgment, injunction, decree or determination applicable to such Party or the organizational documents of such Party, or (ii) result in a breach of or constitute a default under any agreement or instrument to which such Party may be bound or affected;

*Provided, however*, that the Parties acknowledge and agree that the Debtors' foregoing representations and covenants are subject to entry of an Order approving this Agreement.

- 10 -

12.    <u>Notice</u>. Any notice or other written instrument required or permitted to be given pursuant to this Agreement shall be in writing signed by the Party giving notice and shall be sent by hand delivery, certified mail, return receipt requested or overnight courier to the other Parties at the address(es) set forth below:

If to the Debtors:

<u>ONH AFC CS Investors LLC/ONH 1601 CS Investors LLC</u>
Jorian L. Rose
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
Telephone:    (212)589-4200
Facsimile:    (212)589-4201
Email: jrose@bakerlaw.com


If to the Schwartz/Nightingale Parties:

James P. Loonam, Esq.
Thomas M. Wearsch, Esq.
Jones Day LLP
250 Vesey Street
New York, NY 10281-1047
212.326.3939
twearsch@jonesday.com
jloonam@jonesday.com

        AND

Matthew C. Corcoran, Esq.
Jones Day LLP
325 John H. McConnell Boulevard, Suite 600
Columbus, OH 43215-2673
614.281.3822
mccorcoran@jonesday.com

        AND

Elchonon Schwartz
NPG
512 W 22nd St, 8th Floor
New York, NY 10011


Notice may be provided to counsel for the Parties by electronic mail.  Notices may also be provided to such other address or addresses subsequently provided in writing by a Party to the other Parties.

DocuSign Envelope ID: 18D295F9-45EC-4E33-A954-2B5D083CE857

13.     Construction.  The Parties participated jointly in the drafting and preparation of this Agreement.  Therefore, in any interpretation or construction of this Agreement, the Agreement shall not be construed for or against any Party on that basis. No ambiguity shall be construed against any Party based upon a claim that such Party drafted the language.

14.     Amendment.  This Agreement may not be modified, amended, or otherwise altered except in writing executed and delivered by each of the Parties.

15.     Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and assigns, including, without limitation, any chapter 11 or 7 trustee that may be appointed.  None of the provisions in this Agreement are intended by the Parties, nor shall they be deemed, to confer any benefit on any individual or entity not a Party to this Agreement or a successor or assignee of a Party to this Agreement.

16.     Attorneys' Fees and Costs. Each of the Parties shall bear its own costs and expenses in connection with this matter, including, without limitation, legal fees and expenses.

17.     Entire Agreement.  This Agreement constitutes the entire agreement and understanding between the Parties with respect to the subject matter hereof and supersedes all prior or contemporaneous agreements, understandings, representations and statements, oral or written, between the Parties on the subject matter hereof, which agreements shall be of no further force or effect.  Each Party acknowledges that, in entering into this Agreement, such Party is not relying on any statements or representations made by the other Parties other than as expressly set forth herein.

18.     Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement, binding on the Parties.  The Parties agree that facsimile or electronic copies of signatures shall be deemed original signatures for all purposes hereof.

19.     Headings.  Headings in this Agreement are for convenience only and do not constitute a part of this Agreement.

20.     Governing Law.  This Agreement shall be governed by, interpreted, construed, and enforced in accordance with the laws of the State of New York, without regard for that State's conflicts of law or choice of law principles.

21.     Jurisdiction.  This Court (or, upon withdrawal of this Court's reference, the United States District Court for the District of Delaware) shall retain jurisdiction and venue over this Agreement and the Parties for the duration of the performance of the terms and provisions of this Agreement and for the purpose of enabling any of the Parties to apply to the Court at any time for such further order, direction, and relief as may be necessary or appropriate for the construction or interpretation of this Agreement or to effectuate or enforce compliance with its terms.

**[SIGNATURE PAGES FOLLOW]**

- 12 -

IN WITNESS WHEREOF, each Party has executed this Agreement as of the Execution Date.

ONH AFC CS Investors LLC

By: _____
    Name: Anna Phillips
    Title: Manager

ONH 1601 CS Investors LLC

By: _____
    Name: Anna Phillips
    Title: Manager

Elchonon Schwartz individually and to the extent of his interests in or as managing member of AAF 1601 Washington Ave TIC; ONH 2226 Third Ave LLC; Five Park 3003 LLC; 1 Westend PH-A, LLC; 320 Mountain Road LLC; 1835 Market Investors LLC; 1635 Market Investors LLC; 1500 Spring Garden Investors LLC; NG 1601 Washington Ave LLC; Nite Sky Management LLC; ONH Promote LLC; One Night Holdings LLC; Nightingale Properties, LLC; One Night Properties LLC; ES 28 Holdings LLC[1]; ES28 Investments LLC; Nightingale Property Group LLC; The Nightingale Group, LLC; Nightingale Realty, LLC; Midnight Capital Partners LLC

By: _____

    Name: Elchonon Schwartz

ES 1 Westend Residence Trust; The Elchonon Schwartz Family Trust; ES28 Investments Trust; ES ONH Trust; ES Family Life Insurance Trust dated 06.22.2022

By: _____

    Name: Solomon Schwartz
    Title: Trustee

---

[1] ES 28 Holdings LLC be joined to the extent it is confirmed in existence and that Elchonon Schwartz has sign authority for this entity or any entity controlling this entity.

DocuSign Envelope ID: 18D295F0-45EG-4E32-A6F4-2B5B083CE2E7

Elchonon Schwartz individually and to the extent of his interests in or as managing member of AAF 1601 Washington Ave TIC; ONH 2226 Third Ave LLC; Five Park 3003 LLC; 1 Westend PH-A, LLC; 320 Mountain Road LLC; 1835 Market Investors LLC; 1635 Market Investors LLC; 1500 Spring Garden Investors LLC; NG 1601 Washington Ave LLC; Nite Sky Management LLC; ONH Promote LLC; One Night Holdings LLC; Nightingale Properties, LLC; One Night Properties LLC; ES 28 Holdings LLC[1]; ES28 Investments LLC; Nightingale Property Group LLC; The Nightingale Group, LLC; Nightingale Realty, LLC; Midnight Capital Partners LLC

By: _____

Name: Elchonon Schwartz

ES 1 Westend Residence Trust; The Elchonon Schwartz Family Trust; ES28 Investments Trust; ES ONH Trust; ES Family Life Insurance Trust dated 06.22.2022

By: _____

    Name: Solomon Schwartz

    Title: Trustee

---

[1] ES 28 Holdings LLC be joined to the extent it is confirmed in existence and that Elchonon Schwartz has sign authority for this entity or any entity controlling this entity.

# JOINDER AGREEMENT

The undersigned agrees to be bound for all purposes by the Settlement and Conditional Release Agreement, dated ___, 2023, by and among (i) ONH 1601 CS Investors LLC and ONH AFC CS Investors LLC, as debtors and debtors in possession in the Chapter 11 Cases (defined above), on behalf of themselves and their bankruptcy estates, and (ii) Elchonon ("Elie") Schwartz, One Night Holdings LLC, Nightingale Properties, LLC, One Night Properties LLC, ES 28 Holdings LLC,[1] ES28 Investments LLC, Nightingale Property Group LLC, The Nightingale Group, LLC, Nightingale Realty, LLC, Nite Sky Management LLC, AAF 1601 Washington Ave TIC, ONH 2226 Third Ave LLC, Five Park 3003 LLC, 1 Westend PH A, LLC, 320 Mountain Road LLC, 1835 Market Investors LLC, 1635 Market Investors LLC, 1500 Spring Garden Investors LLC, NG 1601 Washington Ave LLC, Midnight Capital Partners LLC, ONH Promote LLC, ES 1 Westend Residence Trust, The Elchonon Schwartz Family Trust, ES28 Investments Trust, ES ONH Trust, Schwartz Family Charitable Trust, and ES Family Life Insurance Trust dated 06.22.2022 (the "**Settlement Agreement**"), as a Party (as defined in the Settlement Agreement).

The undersigned agrees to assign to the Debtors any and all claims and causes of action whether known or unknown, matured or unmatured, arising out of any theory of law, that has arisen as of the date hereof relating the Debtors against the Schwartz Nightingale Parties (as defined in the Settlement Agreement).

Garden Growth LLC

By: _____
        Name:
        Title

---

[1] ES 28 Holdings LLC be joined to the extent it is confirmed in existence and that Elchonon Schwartz has sign authority for this entity or any entity controlling this entity.